Rae E. HELMS, Administratrix of the
Estate of Charles W. Easterday,
deceased, Appellant,

v.

Raymond F. DUCKWORTH et al.,
Appellees.

No. 13714.

United States Court of Appeals
District of Columbia Circuit.

Argued May 28, 1957.

Decided Sept. 19, 1957.

Mr. Benton C. Tolley, Jr., Washington, D. C., with whom Mr. John E. Larson, Washington, D. C., was on the brief, for appellant.

Mr. Geoffrey Creyke, Jr., Washington, D. C., with whom Mr. Henry M. Moore, Washington, D. C., was on the brief, for appellee Duckworth. Mr. J. Mitchell Brown, Washington, D. C., also entered an appearance for appellee Duckworth.

Mr. Philip S. Peyser, Washington, D. C., entered an appearance for appellee National Bank of Washington.

Before EDGERTON, Chief Judge, and WILBUR K. MILLER and BURGER, Circuit Judges.

BURGER, Circuit Judge.

Appellant, administratrix of the estate of Charles W. Easterday, sued for cancellation of a stock purchase agreement between Easterday and appellee Duckworth, by which the survivor would acquire the decedent's stock in a "two man" corporation. Both parties moved for summary judgment. The District Court granted summary judgment in favor of appellee.

The record discloses that in 1948 Easterday, then age 70, was engaged in business as a roofing and sheet metal contractor, an activity he had pursued for 45 years. Duckworth, then age 37, was employed by a roofing contractor. After negotiations the two men executed a contract in April 1948, calling for the formation of a new corporation with 1500 shares of $10 par value stock to be issued at that time, Easterday receiving 51% and Duckworth 49%. Duckworth was to pay for his shares in cash and Easterday was to pay for his by transfer of business assets. Notes were to be given by the new corporation to Easterday for transfer of other business assets having a value in excess of the cost of his shares. The new corporation was to carry on the business established by Easterday.

The contract also provided for the execution of a trust agreement by which each stockholder would place his stock in

trust and agree that on his death (or sooner by mutual consent) his stock would be sold to the survivor or continuing member, "the purchase price of the stock [to the other] * * * [being] the par value of $10 per share unless modified by the parties by subsequent agreement."

Shortly thereafter a formal survivor purchase agreement was executed with appellee Hamilton National Bank as trustee. This agreement spelled out the mechanics of purchasing and pricing the stock in these terms:

"Article II

"Upon the death, prior to the termination of this agreement, of whichever of the parties of the first or second parts is the first to die, the surviving party shall purchase the stock in the aforesaid corporation owned by the deceased stockholder at the time of his death and deposited hereunder, and the Trustee shall sell, transfer and deliver such stock to the surviving stockholder at the price and upon the terms and conditions hereinafter set forth.

"Article III

"The price which the surviving stockholder shall pay for the stock of the deceased stockholder shall be at the rate of $10.00 per share; provided, however, that such sale and purchase price may, from time to time, be re-determined and changed in the following manner:

"During the month of January in any year while this agreement remains in force, the parties of the first and second part shall have the right to increase or decrease the sale and purchase price by an instrument in writing signed by the parties of the first and second parts and filed with the trustee, the last paper writing so filed with the Trustee prior to the death of either of said parties to be final and conclusive in establishing such value and shall effectively fix the price at which the surviving stockholder shall purchase and the Trustee shall sell the stock of the decedent in said corporation."

It is undisputed that in 1948 when the enterprise began the $10 per share figure reflected the real net worth of the company and that as of December 31, 1955, the value of the stock was about $80 per share. There is, however, no evidence that either party ever proposed a change in price in accordance with the trust (survivor-purchase) agreement. Upon the death of Easterday in September 1956, Duckworth tendered to the trustee his check for Easterday's stock priced at $10 per share. Appellant then instituted this suit contending that unless Duckworth agreed to pay the true value of the stock as of decedent's death, i. e., approximately $80 per share, the survivor-purchase agreement should be cancelled.

In support of this contention appellant urges that Duckworth fraudulently induced Easterday to execute the trust agreement by misrepresenting that he (Duckworth) would consent to a periodic redetermination of the stock purchase price; that this misrepresentation violated the confidential relationship existing between the parties, and, in any case, the consideration was so grossly inadequate as to warrant rescission of the agreement.

Appellee Duckworth stands on the letter of his contracts, arguing that there having been no mutually agreed change in the purchase price, the trustee is obligated to transfer decedent's shares at the stipulated contract price of $10 per share.

The basic contract between Easterday and Duckworth and the formal trust agreement implementing it are in general terms typical of agreements made between partners of small businesses or stockholders of closely held corporations where the major stockholders are

also the managers of the enterprise.[1] In this case, however, three provisions are of special significance: Articles II and III of the trust agreement, quoted above, and a clause in the basic contract of April 1948, which provides:

"It is hereby understood and agreed that the majority stockholders will not vote, or cause to be voted, a dissolution of the corporation or a complete disposition of the assets of the corporation without the consent of the minority stockholders." [2]

These three provisions in combination had several significant effects:

(a) they prohibited Easterday as the majority stockholder from dissolving the corporation without consent of Duckworth;

(b) they prohibited Easterday as the majority stockholder from voting a complete disposition of the assets without Duckworth's consent; and

(c) they required a deceased member's estate to sell and the surviving member to buy the stock pursuant to the survivor-purchase agreement.

■ It is equally clear that the agreement contemplated, upon the initiative of either party, a yearly adjustment of the stock price to conform with the realities of a rising or declining net worth of the corporation. The corporate books were kept on a calendar year basis and the trust agreement provided "[d]uring the month of January * * * the parties * * * shall have the right to increase or decrease the sale and purchase price by an instrument in writing * * *." Plainly this implied a periodic bargaining or negotiating process in which each party must participate in good faith. Cf. Chase National Bank of City of New York v. Manufacturers Trust Co., 1943, 265 App.Div. 406, 39 N.Y.S.2d 370, 374.[3] Any other interpretation would render the procedure for adjusting the stock purchase price superfluous since parties to a contract can, at any time, mutually agree to renegotiate and modify specific terms or execute a new contract. Furthermore, absent a bona fide promise or intent to bargain in good faith, either party could at will frustrate the agreement since it provided no alternate method of adjusting the valuation if the parties did not agree on an adjusted price. The absence of a good faith intent to bargain would work especially to the disadvantage of the elderly Easterday, since, having surrendered his normal voting position as majority stockholder, including the power to sell or liquidate the corporation, he could only effect a change in the stipulated price by persuading Duckworth in negotiations. This surrender of these normal and usual powers of a majority stockholder becomes especially significant in the relations between the parties. In operation it altered Easterday's position drastically and placed him dependent entirely upon Duckworth's good faith in negotiating any change in the stock price to reflect fairly the true value.

■ The very heart and core, then, of this agreement was the assumed willingness of each party to bargain and

---

1. See, e. g., Smith v. Taylor, 1935, 65 App. D.C. 40, 79 F.2d 165. See also Currie, Buy And Sell Agreements With Respect To Corporate And Partnership Interests, [1950] Wis.L.Rev. 12; Hornstein, Stockholders' Agreements In The Closely Held Corporation, 59 Yale L.J. 1040 (1950); O'Neal, Restrictions On Transfer Of Stock In Closely Held Corporations: Planning and Drafting, 65 Harv.L.Rev. 773 (1952).

2. Under section 38(c) of Article 23, Maryland Code, Easterday could have conditioned his participation on a reservation in the corporate charter of the right to sell the assets or dissolve the corporation by a simple majority vote. See also Md.Code Ann. art. 23, §§ 62(3), 72(2) (1951).

3. Even under stock purchase options granting stockholders a "carte blanche" power to evaluate the stock at a "reasonable price," the stockholders must act in good faith. Krebs v. McDonald's Executrix, Ky.1953, 266 S.W.2d 87.

negotiate in good faith whenever called upon to revise the price of the stock. Not unlike the duty to bargain in good faith imposed by statute upon employers and unions, good faith in this context "means more than merely going through the motions of negotiating; *it is inconsistent with a predetermined resolve not to budge from an initial position.*" [4] (Emphasis added.) An even higher obligation to bargain sincerely arises under a contract which is not made at arms length, but between parties bearing a relationship of trust and confidence toward each other. Cf. Restatement, Contracts, §§ 497, 498 (1932). While both parties are free to argue and even disagree, each must argue sincerely and in good faith, disclosing all relevant facts, with the hope of reaching a fair agreement and not with a secret intent of preventing agreement. Thus any secret intent on the part of either party to refuse to negotiate fairly and in good faith becomes of vital importance.

We have no way to discern Easterday's intent, if any, as the record is silent. The intentions of Duckworth are not left to speculation or conjecture on this record; they are manifested plainly in his own affidavit, wherein he states:

"Further, he states that provisions of article III of the trust agreement of May 20, 1948 and provisions of a fourth paragraph on page 2 of the contract of April 15, 1948, both require his consent to any change in the price at which the stock could be purchased from the bank as trustee in the event of the death of either party.

"No change was ever made in this price, that he is advised and believes no change could be made without his consent, *that it was never his intention at any time to consent to any change in this provision,* nor was any request or suggestion ever made to him by the late Charles W. Easterday that any change be made." (Emphasis added.)

It is unnecessary for this court to determine whether Duckworth fraudulently induced Easterday to execute the survivorship agreement by means of a misrepresentation or otherwise.[5] In an intimate business venture such as this, stockholders of a close corporation occupy a position similar to that of joint adventurers and partners.[6] While courts have sometimes declared stockholders "do not bear toward each other that same relation of trust and confidence which prevails in partnerships," [7] this view ignores the practical realities of the organization and functioning of a small "two man" corporation organized to carry on a small business enterprise in which the stockholders, directors and managers are the same persons. A distinguishing characteristic of such a corporation is the absence of a division between the stockholder-owners and the director-managers, for the for-

---

4. N. L. R. B. v. Truitt Manufacturing Co., 1956, 351 U.S. 149, 154, 76 S.Ct. 753, 757, 100 L.Ed. 1027, Frankfurter, J., dissenting on other grounds.

5. It is clear that a promise made with the undisclosed intention not to perform it constitutes fraud and renders the agreement voidable. Restatement, Contracts, §§ 473, 476 (1932). It might fairly be inferred that no rational man in Easterday's position would enter a contract with these provisions unless he relied on the agreement as an implied promise to bargain in good faith.

6. Indeed, "chartered partnership" or "incorporated partnership" is a more descriptive and accurate designation of the relationship than "close corporation." See Hornstein, Judicial Tolerance Of The Incorporated Partnership, 18 Law & Contemp.Prob. 435 (1953).

7. Ross v. Biggs, 1949, 206 Miss. 542, 40 So.2d 293, 296. See also Cardullo v. Landau, 1952, 329 Mass. 5, 105 N.E.2d 843; Slade v. Slade, 1949, 337 Ill.App. 575, 86 N.E.2d 425. Contra: Krebs v. McDonald's Executrix, supra note 3; Jones v. Missouri-Edison Electric Co., 8 Cir., 1908, 144 F. 765, 771 ("The relation of a stockholder * * * to his co-stockholders is a relation of trust and confidence."). And see Smith v. Taylor, supra note 1, where despite the corporate form of the enterprise this court recognized a semi-fiduciary relationship.

mer either personally manage and direct the business or so dominate the directors as to render the latter agents. Yet, the fiduciary capacity of directors and dominant or controlling stockholders is unquestioned. Pepper v. Litton, 1939, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281. We believe that the holders of closely held stock in a corporation such as shown here bear a fiduciary duty to deal fairly, honestly, and openly with their fellow stockholders and to make disclosure of all essential information.[8]

■ This rule "is based upon the proposition that, under all the circumstances of the case, it was the duty of the party who obtained the consent, acting in good faith, to have disclosed the facts which he concealed." Strong v. Repide, 1909, 213 U.S. 419, 430, 29 S.Ct. 521, 525, 53 L.Ed. 853. Certainly there must be a duty to disclose information which if known to the other party might lead him either to withdraw or to insist upon some self-executing provisions for stock pricing not capable of being frustrated by the bad faith of either party. But the very nature of Duckworth's secret intent was such that it had to be kept secret and undisclosed or it would fail of its purpose. Having secured Easterday's agreement not to sell his stock nor to vote his stock for the dissolution or disposition of assets and having executed a survivorship agreement with Easterday whereby the stock purchase price was subject to periodic modification, appellee's failure to disclose to his corporate business "partner" his fixed intent never to alter the original price constitutes a flagrant breach of a fiduciary duty. Standing alone this warrants cancellation of the agreement by a court of equity.[9]

■ There is another basis for demanding from appellee the highest degree of good faith in this case and imposing upon him the concomitant duty of full disclosure. Duckworth was trained in both business administration and the law while the record shows nothing to indicate Easterday had any training or experience in drafting contracts. The basic contract incorporates practically verbatim a "preliminary agreement" prepared personally by appellee. The "preliminary agreement," like the subsequently executed contract, provided for adjustments in the price of the stock. The record shows Easterday had no independent legal advice or help and that no independent legal counsel acted for both parties in drafting the trust agreement which set forth the procedure for modifying the purchase price. Indeed, the affidavit of the trust officer of the trustee Hamilton National Bank, which prepared the formal agreement, states "That the *sole participation* of the bank or affiant * * * was limited to the incorporation therein of the *previous agreement* of said parties and defining the duties of the bank as Trustee * *. That at no time did affiant or the bank advise *either party* as to what the price or terms of purchase should be * * * and affiant to the best of his recollection affirms there was no discussion or negotiations in which he participated concerning the price, terms of purchase or the reasons therefor."[10] (Emphasis added.)

It is apparent on this record that Easterday relied on appellee to formulate the technical terms of their agreement. Appellee, as one trained in the law and in the formalized processes of the business world, and who undertook to draft the procedure for purchasing the decedent's

8. See Application of Burkin, 1955, 286 App.Div. 740, 147 N.Y.S.2d 2, 5; Funk v. Spalding, 1952, 74 Ariz. 219, 246 P.2d 184.

9. Courts carefully examine the purchase of a decedent's partnership interest by the survivor for possible fraud or inadequate consideration. See cases collected at 73 A.L.R. 983 (1931). See also Libby v. L. J. Corp., 1957, 101 U.S.App.D.C. 87, 247 F.2d 78; Dexter & Carpenter v. Houston, 4 Cir., 1927, 20 F.2d 647, 652.

10. Affidavit of Aubrey O. Dooley, Trust Officer of The National Bank of Washington (successor to Hamilton National Bank), Record, pp. 66–67.

stock is subject to a special duty to his associate to act in the utmost good faith and reveal any possible conflicts of their respective interests

■ Since our holding rests on the breach of a fiduciary relationship it is not necessary for the appellant to excuse or justify Easterday's failure to have sought a revision of the sale price of the stock. Moreover, it is plain that any request by Easterday in this regard would have been futile. Not only the circumstances but the express and calculated utterances of appellee, made in his affidavit at a time when he could have remained silent as to his intent, make it crystal clear that any effort by Easterday to negotiate a change in the price would have been frustrated. The failure of Easterday to request an adjustment of the purchase price is therefore immaterial in the light of Duckworth's secret intent to frustrate the spirit and letter and indeed one of the basic objectives of the agreement.[11]

There remains the question whether this court should now direct the District Court upon remand to enter summary judgment for appellant. Both parties moved for summary judgment below and there is no factual dispute concerning the provisions of the contract and trust agreement. Upon the present record, as we have indicated, appellant would be entitled to a summary judgment.

But the Supreme Court has cautioned appellate courts when reversing a summary judgment not to direct entry of a similar judgment for appellant "on a new issue as to which the opposite party had no opportunity to present a defense before the trial court." Fountain v. Filson, 1949, 336 U.S. 681, 683, 69 S.Ct. 754, 755, 93 L.Ed. 971. While the issue which we regard as controlling is not strictly a *"new* issue," the Court emphasized that the appellee should be given the chance "to dispute the facts material to a claim" where it appears the District Court did not consider such claim when passing upon the motion for summary judgment. Thereafter, in Elder v. Brannan,[12] we reiterated that even though appellant was entitled to summary judgment on the state of the record, the case should be remanded when the motions for summary judgment did not present the controlling issue to the District Court and that court failed to consider undenied allegations in the depositions. While it appears to us unlikely "[i]t is possible that, upon remand, the [appellee] may be able to raise an issue of fact * * *." [13]

■ While the complaint in the instant case did contain allegations of a violation of a confidential relationship, the motions for summary judgment were not addressed to this claim. Since we are unable to state with a complete or absolute certainty that appellee does not possess additional facts bearing on this issue,[14] and since the District Court has not yet exercised its informed discretion in this regard, we believe the wiser course is to remand the case for further proceedings.

■ We add that if, notwithstanding appellee's sworn admissions, the trial court finds that a *genuine* issue of fact exists as to appellee's good faith, appellee is entitled to an opportunity "to establish the entire fairness of the transaction" and the "findings [of fairness] must be quite clear." Mayflower Hotel Stockholders' Protective Committee v. Mayflower Hotel Corp., 1951, 89 U.S. App.D.C. 171, 175–176, 193 F.2d 666, 670–671. In the circumstances shown by the stipulated facts in this case the

11. Nor will the law penalize Easterday's heirs for decedent's failure to seek an adjustment. D.C.Code 1951, § 12–101.

12. 1950, 87 U.S.App.D.C. 117, 184 F.2d 219, affirmed in part and reversed in part on other grounds, 1951, 341 U.S. 277, 71 S.Ct. 685, 95 L.Ed. 939.

13. Elder v. Brannan, supra note 12, 87 U.S.App.D.C. at page 122, 184 F.2d at page 224.

14. See 6 Moore, Federal Practice §§ 56.12, 56.13, 56.27[2] (2d ed. 1953).

burden of proof is on the litigant charged with a fiduciary obligation.[15]

The order of the District Court is reversed and the case remanded for further proceedings not inconsistent herewith.

Reversed and remanded.

15. See comment and cases collected, 20 Am. Jur., Evidence, § 141 (1939).