ARNOLD DRESDEN

v.

**NORMAN A. WILLOCK, Appellant**

No. 75-1091

United States Court of Appeals

Third Circuit

Argued April 24, 1975

Filed June 13, 1975

ALVIN MILLER, ESQ., New York, New York, *for appellant*
ROBERT A. ELLISON, ESQ., Christiansted, St. Croix, V.I.,
 *for appellee*

Before HASTIE, GIBBONS and HUNTER, *Circuit Judges*

OPINION OF THE COURT

GIBBONS, *Circuit Judge*

The defendant Norman A. Willock appeals from a judgment of the District Court of the Virgin Islands which directed that he specifically perform pursuant to a buy-out provision in a stockholder's agreement with the plaintiff Arnold Dresden. The buy-out agreement requires Willock to purchase 100 shares of stock in Willock Associates, Ltd. which are now worthless from Dresden for $250,000. Willock also appeals the dismissal of his counterclaim for an accounting. The case was tried without a jury. Because the district court misapplied legal precepts to the facts which it found, and in some instances disregarded undisputed evidence, we reverse and remand for further proceedings.

### The Specific Performance Claim

Willock Associates, Ltd. is a Virgin Islands corporation which was created by Willock and Dresden in September,

181

1969 to build, own, and operate the Lime Tree Beach Hotel in St. Thomas. Pursuant to an agreement made at the time of incorporation Willock owned 80 per cent, and Dresden 20 percent of the stock of the corporation (App. at 366a–62a). The stockholder's agreement, dated December 15, 1969, however, by virtue of clauses requiring unanimous action by the directors, and an 85 per cent vote on any corporate matter, vests in Dresden the equivalent corporate power of a majority stockholder. (App. at 323a). The agreement also provides that at any time, Dresden at his sole option, may tender his stock to Willock, who must purchase the stock during the aggrement's first year at a fixed price of $2,000 per share, or book value, whichever is higher. (App. at 324a). The minimum purchase price increases $500 per share each year during the second, third, and fourth years of the agreement. Thereafter, the value of each share is fixed at its book value. (App. at 324a).

On February 4, 1971, pursuant to the buy-out provision in the stockholder's agreement, Dresden tendered 100 shares of stock to Willock and demanded $250,000 in payment. Willock refused to accept the tender, and on March 9, 1971 Dresden filed suit for specific performance of the agreement. However by this time the corporation was experiencing serious financial difficulties and by Dresden's own admission the corporation was insolvent in the sense that it was unable to meet its debts as they matured. (Tr. 96). In June, 1971 the stock was effectively rendered worthless when the creditors foreclosed their mortgage on the hotel, bought in the property at the foreclosure sale, and then secured a deficiency judgment against the corporation. The district court noted that "[a]s of trial [June, 1973] the corporation had no assets and owed considerable sums of money. The book value of its shares therefore is zero or less . . . ." (App. at 370a).

Nevertheless, the court ordered specific performance of the agreement, and further directed that judgment be entered in Dresden's favor in the amount of $250,000 together with interest from May 1, 1971 and attorneys fees should Willock fail to perform. (App. at 380a–81a).

The circumstances leading up to the execution of this singularly improvident and one-side stockholder's agreement began in April 1967 when Willock visited the office of Frank Miller, Esq., an attorney practicing law in New York City for the purpose of seeking representation in obtaining a divorce. Willock was then 29 years old. He had attended Carnegie Institute of Technology for two and a half years majoring in painting and design. He did not complete the required work for a degree. (Tr. 136). From the fall of 1961 until 1967 Willock was engaged in the photography business in association with two other individuals in the operation of a photographic studio. (Tr. 137). Willock's parents were people of considerable means, and according to Willock's deposition testimony, he was the recipient of between $25,000 and $30,000 a year as beneficiary of three trust funds. (Deposition at 6–7).

Arnold Dresden, a member of the New York bar since 1936, was in May of 1967 associated in the practice of law with Frank Miller. Miller turned Willock's matrimonial matter over to Dresden, who over the course of a year brought it to a conclusion, securing Willock a divorce and a custody and property settlement. During that year Willock also conferred with Dresden with respect to a hotel project in the Virgin Islands which Willock was interested in developing. (Tr. 10). Initially, Willock and a friend, one John Morris were desirous of forming an association with a Mr. Malling-Holme of Morningstar Beach Club, with Willock investing money in Morningstar to rehabilitate the existing property and to build 30 or

183

more new hotel units. However they had reached an impasse in their negotiations with Malling-Holme, and so they asked Dresden "to speak to Mr. Malling-Holme and see if [he] could finalize their position. . . ." (Tr. 11). Dresden did negotiate on their behalf with Mr. Malling-Holme, both in the Virgin Islands and in New York, but arrangements with him were never finalized. (Tr. 12).

When the Malling Home deal fell by the wayside Willock and Morris asked Dresden, who had experience in real estate and other commercial ventures, to go down to the Virgin Islands and look at possible alternate sites for the construction of a hotel. (Tr. 19). He did so, and recommended to Willock and Morris purchase of a 16 acre site at Red Hook. He also looked at the present location of the Lime Tree Beach Hotel but did not recommend it. Despite his recommendation, Willock and Morris rejected the Red Hook site and opted for the present location. Dresden negotiated with the owner and purchased the property for $900,000. (Tr.21).

Apparently fairly early in the proceedings there was a discussion about Dresden and Frank Miller being paid for their services in connection with Willock's Virgin Islands project by taking a stock interest in a corporation which had been organized to take over the property. A letter, dated June 4, 1968 on Miller's letterhead addressed to Dresden, reads:

"Dear Arnold:

I have this day accepted a check from Norman Willock in the sum of $17,500, representing payment in full for our services, jointly and severally, in connection with his Virgin Islands project and in extinguishment of our projected stock interests.

I have today paid you therefrom, the sum of $8,000, which represents a full accord and satisfaction between us and for all services

184

rendered by you in all office matters to date, except Jefferson Estate.

Will you please acknowledge our understanding by appending your signature below.

Yours sincerely,<br>Frank L. Miller

Accepted and agreed:

/s/ Arnold Dresden

_____

Arnold Dresden"

(Defendant's Exhibit A).

This letter makes clear that at least up to June 4, 1968, Dresden and Miller were acting as attorneys in connection with the project, that they were initially to be paid in stock, but later were paid in cash for services up to that time. Thus there is no question that Dresden's initial role in the project was that of a fiduciary. Indeed, there is uncontradicted evidence that prior to June, 1968 not only Dresden but also Miller rendered services of a legal nature in the Virgin Islands. (Tr. 146).

Some time between January, 1968 when Willock and Morris decided to acquire the present Lime Tree site, and the June 4, 1968 letter, it was decided that a corporation, Norjon Associates, Ltd., would be formed to take title to the site. The four beneficial owners were Willock, 65 per cent, John Willock, his brother, 10 per cent, John Morris 15 per cent, and Dresden 10 per cent. (Tr. 13). There is no testimony as to what consideration Dresden was to pay or provide for his 10 per cent interest in Norjon, but he testified he never paid cash for his interest. (Tr. 13). In fact as Dresden testified, the corporation was financed by $800,000 in capital contributions and loans, all provided by Willock, his brother John Willock, and Willock's parents. (Tr. 14). Norjon experienced financial difficulties

and eventually dissolved in September, 1969. Its assets and liabilities were transferred to a new corporation, Willock Associates, Ltd. (Tr. 15–16). Dresden testified that this took place when the project was 30 or 40 per cent completed but additional financing was required. The only available source for such financing was Willock's parents, and they declined to go forward so long as John Morris remained as principal. (Tr. 14–15). This new arrangement is confirmed by a letter dated September 22, 1969 on the letterhead of Arnold Dresden, addressed to Willock in St. Thomas which is set forth in full in the margin.[1]

---

[1]

"ARNOLD DRESDEN
2100 Linwood Avenue
Fort Lee, N.J. 07024

Mr. Norman A. Willock
c/o 'Limetree'
Box 4986
St. Thomas, V.I.

Re: Willock Associates, Ltd.
Purchase of 'Limetree Project'

Dear Norman:

This letter will serve to express and confirm our mutual understanding and agreement in reference to the above corporation as follows:

A) Willock Associates, Ltd. is being incorporated in the Virgin Islands with an authorized capital stock of 1000 shares, no par value.

B) Upon incorporation, 500 shares of the authorized capital stock, shall be issued as follows:

1. To Norman A. Willock—350 shares of the no par common stock for which Norman A. Willock shall pay to the corporation, or forgive its obligation to him, the sum of $210,000.00.

2. To John H. Willock—100 shares of the no par common stock for which John H. Willock shall pay to the corporation, or forgive its obligation to him, the sum of $60,000.00.

3. To Arnold Dresden—50 shares of the no par common stock in consideration of services heretofore performed by him in promotion and organization of the said corporation and the obtaining by him of various financing committments [sic] and loans on behalf of said corporation.

C) Upon issuance to you of the 350 shares of no par common stock as provided above, you will sell, assign and deliver to me fifty (50) shares of such amount, for which I will pay you $30,000.00, to be paid by me to you in five (5) annual installments of $6000.00 per year, the first payment thereof to be due October 1, 1970, and a like sum annually thereafter on October 1st of each year next ensuing, until the full amount as provided has been paid. As evidence of such obligation, I shall execute and deliver to you simultaneously with the assignment and delivery of the aforementioned 50 shares, five (5) promissory notes

186

■ It is clear from paragraph B-3 of this letter agreement that Dresden obtained his initial 10 per cent interest

"in consideration of services heretofore performed by him in promotion and organization of the said corporation and the obtaining by him of various financing committments [sic] and loans on behalf of said corporation."

It is clear, as well, that at least a substantial part of these services were performed in the capacity of attorney. Dresden negotiated with banks in the Virgin Islands and Pennsylvania, and with Willock's parents, over the terms of mortgage financing. He negotiated with the contractor which built the hotel over the terms of the construction contract. He represented the corporation and Willock in New York when, in an effort to raise money for the St. Thomas hotel project, Willock mortgaged property he owned in Long Island. In all these instances he was performing services which, though not necessarily performed by attorneys acting as such, frequently are. Moreover he represented Willock when the latter purchased a home in St. Thomas, doing whatever legal work was required. He assisted Willock in obtaining mortgage financing for the home purchase.

The district court, referring to some of these specific legal services, concluded:

> payable to you, each in the sum of $6000.00, due as aforesaid and each bearing interest at 7% per annum.
> Your signature, where indicated below, will express your agreement and acceptance of the foregoing.
>
> Yours truly,
> /s/ Arnold Dresden
> _____
> Arnold Dresden
>
> Agreed to:
> /s/ Norman A. Willock
> _____
> Norman A. Willock"

(Defendant's Exhibit C).

"Apart from those matters I have just cited, I see no indication of the attorney-client relationship and I am not inclined to presume a continuing one." (App. at 374a).

This is not a finding of fact falling within Rule 52(a) Fed. R. Civ. P. Rather it is a statement of legal conclusion, or perhaps a statement of an ultimate factual inference to be drawn from undisputed historical facts. However, whether it is a legal conclusion or an ultimate factual inference, we hold it to be error.

Dresden's relationship with Willock and with the Lime Tree hotel project started out as an attorney-client relationship. The fact that Dresden was to be paid by receiving stock in the enterprise did not change the nature of the relationship. He continued to render legal services. To paraphrase the district court, we see no indication that the attorney-client relationship ever ceased, and we are not inclined to presume that it did. That Dresden may have held another position in Willock Associates, Ltd. did not divest him of the fiduciary obligations incident to his role as attorney.

Willock Associates, Ltd. was incorporated on September 23, 1969. Although the September 22, 1969 letter agreement provided that John Willock was to become a 20 per cent stockholder in Willock Associates, Ltd., some time prior to the issuance of any stock he advised that he preferred to remain a creditor for his advances to the enterprise. No stock certificates were actually issued by that corporation until December 15, 1969, the same date as the contract in suit. On October 1, 1969, apparently pursuant to an oral agreement, Willock Associates, Ltd. began accruing salaries to Willock and to Dresden at the rate of $2,000 a month. (Tr. 208–09). By December 15, 1969 there was an accrued salary obligation to each of them of $5,000. (Tr. 209). On the asset side, since Willock Associates, Ltd. had acquired all the assets of the dissolved

188

Norjon corporation, it held as an asset an account receivable from Dresden in the amount of $20,900 which Norjon had carried in the officers loan account. (Tr. 207–08).

Summarizing the situation that existed until December 15, 1969: no stock had been issued; the corporation was accruing a salary to Dresden for his current services; Dresden held a contract providing that he was to get a 10 per cent stock interest for past services; Dresden held a contract pursuant to which he would purchase from Willock another 10 per cent interest for $30,000 in five annual installments to be evidenced by notes; and Dresden owed the corporation $15,900 net of accrued salary. Thus although the notes referred to in the September 22, 1969 letter agreement were never issued, Dresden owed Willock $30,000 and the corporation $15,900. At that time, according to the uncontradicted testimony of Danielson, an accountant who conducted an audit of the corporation's account books as court appointed receiver, Willock Associates, Ltd. was insolvent in the sense of its inability to meet its obligations as they matured. (Tr. 210). Dresden himself under cross-examination testified that the corporation was insolvent at the time the stockholder's agreement was executed. (Tr. 96). Whatever assets the corporation held represented cash advanced by Willock and members of his family or constituted the proceeds of mortgage loans. Although no stock certificates has as yet been issued, the withdrawal of John Willock as a stockholder in the corporation left Willock and Dresden as sole owners; Willock 90 per cent and Dresden 10 per cent. Both were devoting a great deal of time to the project, which was under construction but running behind schedule. The record does not disclose whether directors and officers had been formally elected as of December 15, 1969, but there is no doubt that Dresden, functionally at least, was not only a

stockholder in, and an attorney for the corporation, but a director and officer as well. Moreover Dresden's testimony makes clear that as a result of his experience in law and business and Willock's comparative inexperience, his was the responsible hand on the corporate tiller, and that Willock so regarded him. Dresden handled such matters as the negotiation of construction contracts and mortgage financing, while Willock selected furniture and silverware. (Tr. 33–36, 38).

On December 15, 1969, at the partially completed hotel, Dresden presented ten certificates of stock in the corporation to Willock for signature which he, Dresden had prepared. Each certificate bears the following legend in Dresden's handwriting:

"This stock certificate is held subject to the terms of an agreement dated December 15th, 1969, made by Norman A. Willock and Arnold Dresden being the sole stockholders of Willock Associates, Ltd., a copy of which is on file in the office of the Corporation."

He also presented the contract in suit. That contract was prepared by Dresden in a handwritten draft, and was typed at a Virgin Islands law office which had handled the formalities of incorporation of Willock Associates. Willock did not see the contract prior to December 15, 1969 and consulted with no one other than Dresden prior to executing it. (Tr. 153).

The testimony as to what transpired on December 15, 1969 is somewhat in conflict, and the district court made no specific findings except that the agreement was in fact executed, that a certificate for 50 shares was issued from the corporation to Dresden directly and that a certificate for 50 shares issued in Willock's name was immediately endorsed by him to Dresden. (App. at 372a–73a). This gave Dresden a 20 per cent interest, although he never executed the notes for $30,000 referred to in the September 22, 1969 letter agreement. Dresden

testified that he told Willock that the Corporation owed him $35,000 and that this was the consideration for the assignment of the additional 10 per cent interest. (Tr. 91). He also testified that he had no personal knowledge that the corporation owed him this amount. (Tr. 91). However, the only evidence adduced at trial from anyone who examined the books and records is that Dresden owed the corporation $15,900. There is no evidence whatsoever as to the source of any liability of Willock Associates, Ltd. to Dresden in December, 1969 even approaching $35,000. Dresden testified that he "had nothing in the corporation." (Tr. 94).

Willock's version as to the reason why he assigned an additional 50 shares to Dresden is somewhat different. In December 1969 he was about to get married and wanted to buy a house in the Virgin Islands. He needed a down payment of $35,000 or $40,000, and did not want to approach his parents for yet another loan. (Tr. 150).

"So in discussing this with Mr. Dresden he proposed a way to get some money for the down payment and I would be able to get a $50,000 mortgage for the remainder.

Q Well, what was the way he suggested to you?

A He told me that he had some money due him from the corporation and that if I were to assign this stock that it would be sort of a transfer on the book of the corporation.

Q And that you were to get the money to make the down payment, is that it?

A Yes, sir." (Tr. 150–51).

What is common in the two versions is that Dresden represented to Willock that on December 15, 1969 the corporation owed him $35,000 when in fact it did not. Even if Dresden did not consciously lie, he made a representation having no personal knowledge of the facts. His fiduciary obligations as an attorney, as an officer and

191

director, and as a stockholder in a closely held corporation, required a higher standard of conduct.

▉ Dresden's testimony concerning the conversation leading up to the signing of the stockholder's agreement on December 15, 1969 is quoted in full in the margin.[2] The most significant aspects of this conversation are the missing elements. Dresden did not explain that he was getting an additional 10 per cent without delivering the promissory notes. He did not explain that Willock was delivering deadlocking control of the board of directors to a 20 per cent stockholder. He did not explain that Willock was giving up voting rights in another 30 per cent of the corporation's stock. He did not explain that Willock was in effect giving him a $200,000 note which would increase by $50,000 a year for five years. He did not explain that Willock, a 90 per cent stockholder, did not need Dresden's help to take the down payment for the house out of corporate funds. These omissions are consistent with Willock's version of the conversation and with his testimony that Dresden did not explain the legal significance of the document and that he didn't understand it.[3] (Tr. 153–58). The change in positions about to be wrought by the execution of the stockholder's agreement dictated that

---

[2] "Q And when you showed him this agreement what did you say to him and what did he say to you?

A Well, I think it was this agreement and a couple other papers that had to be signed at that time and I gave him the papers and I said, 'These are the papers that have been prepared. Read it.' And I gave it to him and he read it. Then we had some discussion about the problems at the hotel, what the prospects were and so forth. And then he examined the agreement again and he said to me. 'Does this mean that you are going to withdraw?' And I said, 'No, it doesn't mean that at all. I intend to stay with this hotel, finish it, and I hope it's successful so I can take some pride in it,' and he signed the agreement and that was it. He signed some other papers there too. I think we had some salary provisions by resolution. I think we had some kind of direction by our corporate accountant to do certain things but for the moment I can't recall, unless I go back to notes." (Tr. 43–44).

[3] "Q You mean to tell this court that you signed such an agreement without knowing its legal significance?

A Yes, sir.

Q And why would you have done that?

Dresden as a fiduciary give Willock a thorough explanation as a minimum requirement of fair dealing in these circumstances.

Dresden urges that the true consideration for the agreement was his undertaking to see the project through to completion. The short answer to this contention is that he made no such undertaking. The stockholder's agreement gave him the right to demand $200,000 for his stock and abandon the project on December 16, 1969. The agreement imposed no obligation on Dresden whatsoever other than to refrain from selling his 20 per cent stock interest to anyone other than Willock. Since there was no other possible purchaser, this hardly qualifies as a fair consideration for a fixed obligation of $200,000 increasing at the rate of $50,000 a year, and for the surrender to Dresden of effective deadlock power over a corporation in which he had invested not a penny. Moreover, Dresden's salary of $2,000 per month continued to accrue for whatever services he was rendering.

The district court, conceding that the parties were in effect partners, and that a fiduciary relationship existed between them, concluded:

"On the whole, I am not convinced that this agreement was so one-sided that it must be struck down." (App. at 376a).

The district court asked the wrong question. The proper question is whether a party to a contract, who in a fiduciary capacity as an attorney, an officer, a director, and a minority stockholder in a closely held corporation, induced the majority stockholder to execute it without fully and fairly disclosing to that stockholder essential

---

A I was under pressure something that I wanted and I was ready to sign most anything.
Q And what was the pressure and what was it that you wanted?
A I wanted to obtain this house; this is the way for me to do it." (Tr. 154).

193

information relating to its fairness, may nevertheless enforce it. The answer is that he may not.

That answer is expressed quite forcefully in Judge (now Chief Justice) Burger's opinion in Helms v. Duckworth, 249 F.2d 482 (D.C. Cir. 1957).[4] That case dealt with the fiduciary duty of a minority stockholder in a closely held corporation to make full disclosure before inducing a majority stockholder to sign a stockholder agreement similar to, but less one-sided than that one in issue before us. The court held that material non-disclosure of relevant facts, standing alone, warranted cancellation of the agreement by a court of equity. The situation before us is an a fortiori case both in respect to the materiality of the non-disclosures, and in respect to the one-sided nature of the contract. Here there was affirmative misrepresentation that the corporation owed Dresden $35,000. In Helms the court pointed to the superior training of the minority stockholder in law and business as an additional reason for demanding the highest degree of good faith and the concomitant duty of full disclosure. 249 F.2d at 487. That additional reason is abundantly present in this case. To it we may also add the expectation of candor generated by prior legal representation in personal and corporate matters.

---

[4] "This rule 'is based upon the proposition that, under all the circumstances of the case, it was the duty of the party who obtained the consent, acting in good faith, to have disclosed the facts which he concealed.' Strong v. Repide, 1909, 213 U.S. 419, 430, 29 S. Ct. 521, 525, 53 L.ed. 853. Certainly there must be a duty to disclose information which if known to the other party might lead him either to withdraw or to insist upon some self-executing provisions for stock pricing not capable of being frustrated by the bad faith of either party. But the very nature of Duckworth's secret intent was such that it had to be kept secret and undisclosed or it would fail of its purpose. Having secured Easterday's agreement not to sell his stock nor to vote his stock for the dissolution or disposition of assets and having executed a survivorship agreement with Easterday whereby the stock purchase price was subject to periodic modification, appellee's failure to disclose to his corporate business 'partner' his fixed intent never to alter the original price constitutes a flagrant breach of a fiduciary duty. Standing alone this warrants cancellation of the agreement by a court of equity." 249 F.2d at 487 (footnote omitted).

Since the undisputed facts establish that Dresden, the plaintiff-fiduciary, did not in procuring the execution of the December 15, 1969 stockholder's agreement make full disclosure of all essential information to Willock, the defendant cestui, a court of equity may not specifically enforce that contract. Thus the judgment awarding Dresden's specific performance must be reversed.

## The Counterclaim for an Accounting

■ Willock counterclaimed for an accounting. The district court entered judgment in Dresden's favor. The latter urges an affirmance because in his view Willock lacked standing to seek an accounting. It is undisputed that over $564,000 borrowed from Willock or from his father for use of the corporation was deposited in Dresden's personal account at the Irving Trust Company in New York. Dresden's standing argument is that he need account only to Willock, Sr. who loaned the money, and who is not a party, or to the corporation, which is not a party. We reject the argument that the agent of a borrower who procures funds from a lender need account only to the lender. Dresden received the funds as agent for the corporation. We reject, as well, the contention that Willock lacks standing to seek an accounting. The corporation is not named as party because by operation of the December 15, 1969 stockholder's agreement Dresden has effectively deadlocked it. Moreover, as the district court suggests, these parties operated more as partners than in strict compliance with the corporate form. In such circumstances Willock clearly has standing, both derivately and directly, to demand that the corporation's agent, officer, director and attorney account. See Funk v. Spalding, 74 Ariz. 219, 246 P.2d 184 (1952).

After this action commenced, Dresden made available to Danielson, Willock's accountant, the records with respect

to his bank account in the Irving Trust Company. Using Internal Revenue standards for passing on the legitimacy of expenditures claimed to have been made on behalf of the corporation, Danielson testified that Dresden had properly accounted for all but $59,766.94 of the $564,500 in corporate funds deposited in the New York account. (Tr. 244–45). At trial, Dresden offered an explanation as to four checks aggregating $7,208.05 which Danielson had questioned. His testimony and Danielson's is in sharp dispute as to the propriety of the expenditures represented by these four checks, and the district court made no specific finding about them. In his testimony Dresden offered no explanation whatsoever with respect to the balance of claimed disbursements and payouts totaling $52,558.89. The district court declined to enter judgment even for this amount, but ruled that in the circumstances Dresden had sufficiently accounted for the corporate funds which came into his hands. (App. at 377a).

 In so ruling the court erred. Dresden received the funds as agent for the corporation. His duties as agent of a Virgin Island principal are those set forth in the Restatement (Second) of Agency § 382, 1 V.I.C. § 4. Section 382 of the Restatement provides that an agent has a duty to keep and render to his principal an account of money or other things which he has received or paid out.

"If the principal proves or the agent admits that the agent has come into possession of money or other thing for the principal, the agent has the burden of proving that he has paid it to the principal or disposed of it in accordance with his authority."
Restatement (Second) of Agency § 382, comment e.

See also Restatement (Second) of Agency § 399, comment e.

Dresden was more than a mere agent. As an officer and director, and as legal counsel, he occupied a fiduciary relationship of the highest order. Clearly then, when it was

established that he received $564,000 of corporate funds which he commingled with his own, the burden of proof as to the propriety of the expenditures was on him.

As the case was tried, Willock offered the testimony of his accountant, Danielson, who testified that he had asked Dresden to account for the funds deposited in the Irving Trust Company, and that Dresden accounted satisfactorily for all but $59,766.94 (Tr. 215). Danielson was questioned about the standard of accountability he applied to Dresden with respect to the Irving Trust Company funds. He answered, "[w]e used the same standards as those used in an examination by the Internal Revenue Service in determining whether or not an item is deductible" as a business deduction. (Tr. 215).

On cross-examination, Danielson identified Plaintiff's Exhibit Number 5, which consisted of a series of schedules of check numbers, names of payees, amounts, and descriptions of disbursements which were furnished by Dresden to Danielson with the representation that all were made on behalf of the Virgin Islands hotel project. (Tr. 231–32). The exhibit was admitted in evidence on the understanding that it comprised the papers furnished to Danielson, but without any concession as to its accuracy. (Tr. 235). Danielson testified that he and members of his staff had sought explanations for the disputed $59,766.94, but although Dresden gave some sort of explanation for most items he was unable to furnish proper verification or documentation for about 42 items totaling that amount. (Tr. 236–49). Thus when Danielson's testimony ended it had been established that an accounting still was sought with respect to $59,766.94, and that Plaintiff's Exhibit Number 5 had been introduced for a limited purpose, which did not include any concession as to its accuracy with respect to the disputed items.

197

Dresden then testified. He acknowledged that the $564,000 was deposited in his account but that the account was used solely as a conduit to expedite payments to creditors at a time when the corporation's financial affairs were in chaos. (Tr. 266–68). However, he made no specific reference to the verification problem concerning the disputed $59,766.94 except for an attempt to justify disbursements with respect to four checks totaling $7,208.05 which were characterized as typical of the variety of payments which had been rejected by Danielson. (Tr. 285–91). When Danielson took the stand in rebuttal he emphasized that all four items had been rejected because they lacked appropriate accompanying documentation such as invoices or statements. (Tr. 298–300). No other evidence was offered by way of explanation or verification of the disputed items.

The district court concluded:

"Plaintiff has submitted documents which, I find, more than account for the figure mentioned by defendant. The total figure submitted by plaintiff in his accounting is $568,047.50, plus an additional amount in an additional document of $56,034.05. Defendant states that there are duplications in this amount and in any event, as far as his total is concerned, plaintiff, has failed to account for $59,766.94. This is not to say that plaintiff has not submitted an explanation for vouchers totalling this amount. Rather, it is the position of defendant's accountant that the vouchers which came up to this total are either not properly documented or in some way lack verification. The accountant stated that he approached this problem allowing deductions in accordance with standard IRS practices. I, however, taking into consideration the total dealings between these parties, the manner in which they dealt with each other, and the circumstances under which they functioned, (witness the 'scatter-short' approach of defendant to the figure for which accounting was demanded) all as set out in this memorandum, decline to apply so strict a standard, more so because it would be imposed, after the fact." (App. at 377a–78a).

■ There are several difficulties with the court's approach. First, it treats Plaintiff's Exhibit Number 5 as if it was received in evidence for the truth of its assertions, when in fact it was received for a limited purpose. (Tr. 235). Since Exhibit 5 was so received it cannot be relied upon as carrying the agent's burden of proof. Next, the court's approach shows no appreciation of the fact that Dresden had such a burden to carry. Third, while rejecting the Internal Revenue Service standard the court does not suggest what standard it had applied. Taking into consideration the fiduciary relationship between Dresden and Willock Associates, Ltd. it seems to us that the standard applied by Danielson in seeking an accounting of corporate funds commingled in an agent's bank account was quite appropriate. But in any event, because Danielson was not satisfied, Willock pressed his counterclaim for an accounting, and Dresden had the burden of proof. With respect to $52,558.89 of the disputed $59,766.94 Dresden introduced no verification or corroborating documentation. Danielson's testimony that Dresden had made an unsatisfactory explanation was not evidentiary of the propriety of the expenditures. The district court's conclusion that on all the evidence Dresden has sufficiently accounted for the corporate funds which came into his hands, to the extent that it represents a factual determination, is therefore clearly erroneous.

■ As already indicated, Dresden did give an explanation with respect to four items totaling $7,208.05. That explanation was disputed in rebuttal testimony by Danielson. The district court made no specific finding as to whether on the disputed items Dresden met his burden of proof, and we cannot on appeal resolve that issue. On remand the district court must resolve the dispute mindful

of the appropriate burden of proof.[5] Since the party having the burden of proof offered no explanation as to $52,558.89, judgment should be entered against him in that amount.

## Conclusion

The judgment specifically enforcing the December 15, 1969 stockholder's agreement shall be reversed. The judgment dismissing the counterclaim for an accounting shall be reversed and the case remanded with a direction that judgment be entered in favor of Willock and against Dresden for no less than $52,558.89, and with the further direction that the court make findings consistent with this opinion with respect to the four disputed items totaling $7,208.05. The form of judgment should provide appropriate protection against exposure to liability to Willock Associates, Ltd. On remand the district court shall determine the propriety of an award of counsel fees to Willock.

---

[5] Willock sought an accounting with respect to several corporate items which did not pass through the Irving Trust account. Dresden testified on these, and Willock does not question them on this appeal.