This appeal involves a suit for alleged fraud and violation of fiduciary duty in connection with the purchase of stock by one stockholder/director of a closely-held corporation from another stockholder/director. The jury awarded $300,000 to the plaintiff but the trial court, upon defendant's motion, granted a judgment notwithstanding the verdict or, should that be reversed, a new trial.
The controversy is between Earl J. Grant, Jr., whose widow, as executrix, has represented his interest since before trial,[1]
and B.R. Winstead, Jr. In October 1977 Grant sold his stock in Charles H. McCauley Associates, Inc., to Winstead. Grant worked for the McCauley architectural firm as a designer when Mr. McCauley died in 1970. Grant and four other long-time employees of McCauley formed Charles H. McCauley Associates, Inc., and caused the corporation to purchase McCauley's interest in the firm from his estate in 1971. These five individuals, Grant, Charles J. Snook, Robert H. Adams, W. Eugene Braswell, and Frank Burford, Jr., bought 80 shares each of the corporation's 400 shares. Each one contributed $9,600 and his individual guaranty on the corporation's note for $800,000.
In February 1974 the firm hired Winstead to serve as financial officer and later as secretary of the company. On September 27, 1974, Winstead purchased 60 shares in the company, 20 each from Grant, Burford, and Braswell.[2] Winstead paid $2,400 cash and executed notes for $44,300 for each block of twenty shares. Title to the shares was transferred to Winstead, but the notes were secured by the shares and the certificates were retained by the sellers. On January 17, 1977, Winstead gained clear title to 12 of the shares sold by Grant and 12 sold by Burford.[3] Each seller cancelled the note payable to him in the amount of $44,300 and accepted a new note for $17,720 secured against the remaining eight shares. Burford testified that Winstead paid him $1300 or $1400 cash at this time. Winstead testified that he paid $1339.80 to Grant. Thus, the evidence was that Winstead bought the first 12 shares from Grant for a total of $3739.80.
The transaction over which Grant sued was the sale of his remaining 60 shares to Winstead and the cancellation of the $17,720 note in October 1977. The consideration was $30,000 paid by Winstead to Grant, $10,000 severance pay from the company, and $3,200 paid to Grant from the company as final payment for the remaining eight shares sold to Winstead in 1974. Burford entered into an identical transaction with Winstead at the same time. Grant argues that the consideration was vastly out of proportion to the true value of the shares at the time,[4] which Winstead knew but Grant did not. He claims that Winstead fraudulently induced him and Burford to enter into the sale by manipulating the financial reports of the company to portray a bleak picture of its condition and prospects and by concealing information which he had a duty to disclose.
Grant's principal argument is that Winstead, as a director and the financial officer of this closely held corporation, owed a fiduciary duty of good faith and fair dealing with Grant when purchasing his shares in the corporation. He argues that Winstead, a certified public accountant, knew the value of the stock much better than did Grant, who worked for the firm as a designer and was not even an architect. Grant claims that Winstead embarked upon a fraudulent scheme to take over the *Page 38 
company by misrepresenting its financial condition and prospects.
Grant offered the testimony of James Landis as evidence of Winstead's fraudulent intent. About the time Braswell left the company in August 1976, Landis was approached about taking Braswell's place in the company. Landis stated that after the initial contact, Winstead invited him and his wife to Winstead's house for dinner. The occasion was almost exclusively social, but Landis testified that at one point when their wives were in another room, Winstead said he would like Landis to come with the company and if he did, "he and I together would take over the company." Landis testified that he made no reply and nothing further was said about the remark.
As proof of his allegations that Winstead falsified and misrepresented the financial condition of the company, Grant introduced the financial reports Winstead submitted to the directors. Winstead customarily submitted cash basis monthly reports including a balance sheet and an income statement. In addition to the usual monthly report for July 31, 1977, Winstead submitted a year-to-date report using the accrual method of accounting. This report showed the net income of the company for the five months of the fiscal year beginning on March 1, 1977, to be only $22,000.00. Grant contends that this statement understated fees earned by $400,000 and served to explain away the favorable cash situation shown in the monthly report.
The flaw in Grant's argument in this respect is that he presented no qualified evidence of any falsity, misrepresentation, or failure to follow accepted accounting methods in any of the financial reports. Winstead classifies the case as a suit for professional malpractice and states that the failure to offer any expert testimony constitutes a failure of proof. Grant replies that the suit is for fraud and breach of fiduciary duty and the financial statements were only an element of the means used to carry out the fraudulent scheme.
Even accepting Grant's view of the case, there was no evidence that the financial reports were false or misleading. The accrual method report for the five months ending July 31, 1977, followed the same accounting practices as the yearly company statements which were audited by an independent accounting firm. Grant's attacks on this and other financial reports issued by Winstead amounted to no more than unsubstantiated allegations. Grant's estate claims that he, being unsophisticated in financial matters, could not have understood the reports and was misled into believing the stock was worth substantially less than its true value.
Not only is this contention contrary to the evidence that Grant participated in the monthly board meetings and thus was knowledgable of the financial aspects of the company, it is also pure speculation. It amounts to little more than a supposition that, if Grant did not read the reports carefully, he might not have understood the stockholders' equity reflected in them. A verdict may not be based purely on speculation.Perdue v. Gates, 403 So.2d 165 (Ala. 1981).
Also fatal to Grant's fraud claim is the lack of evidence of reliance. "In actions for fraud, it is necessary that there be a false representation concerning a material existing fact. The plaintiff must rely on that false representation and must be damaged as a proximate result." Pugh v. Kaiser Aluminum Chemical Sales, Inc., 369 So.2d 796, 797 (Ala. 1979); Code 1975, § 6-5-101; Fountain-Lowery Enterprises, Inc. v. Williams,424 So.2d 581 (Ala. 1982); Earnest v. Pritchett-Moore, Inc.,401 So.2d 752 (Ala. 1981).
Burford testified as to the sequence of events leading up to the final sale of stock to Winstead in October 1977. The company had several major lawsuits pending against it and there were not many new jobs coming to the firm. "I could see the amount of work assigned to the men in the drafting room. And it didn't take a genius to see that we didn't have enough work, really, to sustain the company." The corporation had recently paid off the balance *Page 39 
on the $800,000 note, issued in connection with its formation, and on which Burford and Grant had had contingent personal liability. Burford testified that this was "a load off of my back" and contributed to his decision to get out of the company at that time.
Burford went to Winstead early in October and offered to sell his remaining sixty shares for $30,000. He testified that he arrived at that figure "entirely on my own" and that Winstead had not approached him nor ever said anything to him about buying his or anyone else's stock. Winstead did not accept the offer right away but said he would think about it. Burford then told Grant that he had made the offer.
Grant made a similar offer to Winstead the next day, asking for $30,000 for the 60 shares and $20,000 for the final payment on the note and the eight shares from the original sale to Winstead. Winstead again said he would think about it. He later made a counteroffer and the parties negotiated the transaction which has been described above.
There was little or no evidence that Grant relied on any alleged misrepresentations by Winstead in selling his stock. Instead, he relied on the initiative of Burford, who decided to sell for reasons independent of any financial reports or information promulgated by Winstead. After making the offer, Burford talked to Jim Snow, an independent C.P.A. who audited the firm's annual statements. Burford could not remember whether Grant went with him to Snow on this occasion, but testified that he and Grant discussed the firm's finances with Snow on numerous occasions. Snow was Grant's personal accountant and prepared his income tax returns. Winstead testified that Grant requested two payments of $15,000 for the stock in 1978 and 1979 on Snow's advice. Thus, not only did the evidence show that Grant acted on Burford's initiative, but also that he had independent, competent advice, or at least ready access to it, from Snow.
Grant's claim of breach of fiduciary duty raises the additional charge that Winstead, having superior knowledge of the true value of the stock, had a duty of good faith and fair dealing in purchasing the stock. Grant argues that Winstead breached this duty when he accepted Grant's and Burford's offers without disclosing that the stock was worth approximately six times more than they were asking for it.
Grant bases the assertion of a duty of good faith and fair dealing on the rationales of such cases as Belcher v.Birmingham Trust National Bank, 348 F. Supp. 61 (N.D.Ala. 1968);Newton v. Hornblower, Inc., 224 Kan. 506, 582 P.2d 1136 (1978); and Dockum v. Lloyd, 647 P.2d 459 (Okla.App. 1982). From our own research we would include, as expositive of the principle,Ingalls Iron Works Co. v. Ingalls Foundation, 266 Ala. 656,98 So.2d 30 (1957); Western Grain Company Cases, 264 Ala. 145,85 So.2d 395 (1955); Barnett v. Kirshner, 527 F.2d 781 (2d Cir. 1975); Dresden v. Willock, 518 F.2d 281 (3d Cir. 1975); Helmsv. Duckworth, 249 F.2d 482 (D.C. Cir. 1957); and Childs v. RICGroup, Inc., 331 F. Supp. 1078 (N.D.Ga. 1970).
The federal court in Belcher made an excellent statement of the principle:
 "In Williams v. Riddlesperger, 217 Ala. 62, 114 So. 796 [(1927)], the court said:
 "`With respect to existing stockholders, a failure by directors to inform them of their company's insolvency, or bad financial condition, before inviting or receiving their subscriptions for additional stock, would undoubtedly amount to actionable fraud, because the relationship is one of trust and confidence. [Citations omitted.]'
 "On principle there would be no difference as to a director's duty where there was failure to disclose the actual value of the corporation's assets at the time of the acquisition of an owner's stock or the attempt to acquire same. Actual concealment of the value or the appreciation in value would render the director's act even more offensive to the principle."
Belcher v. BTNB, supra, 348 F. Supp. at 137-38. *Page 40 
While we think the principle is sound, the difference in familiarity with the operation of the business between Grant and Winstead was not so great as to invoke a fiduciary duty on Winstead's part to make further disclosures. In Belcher and other cases finding a breach of duty, such as Dresden, the offending director was the active manager of the business and the plaintiff stockholders either were not involved in the day-to-day operation of the business or were dominated by the offending director.
Neither of these is true of Grant. Not only was he working in the firm every day, he was privy to the regular meetings of the board of directors where the company's situation was openly discussed. The reports submitted by Winstead showed the favorable cash and equity positions of the company. These reports were in Grant's possession and a cursory examination of them would have revealed that the company had substantial assets. We do not see that Winstead should be held to a duty of revealing anything more than he did.
This case is closely analogous to Baylor v. Jordan,445 So.2d 254 (Ala. 1984). This Court held that there was no fiduciary duty between the plaintiff and defendant, officers and directors of a closely-held corporation, because they were dealing with each other as shareholders. Thus, defendant had no duty to disclose the participation of a bank officer who was helping finance defendant's purchase of plaintiff's stock.
Finally, Grant argues that the trial court erred in directing a verdict for Winstead on the count alleging violation of Code 1975, § 8-6-17. The court did not err in directing a verdict, because the statute requires a fraud, an untrue statement of a material fact, or a failure to state a material fact necessary to prevent misleading. As the discussion above points out, Grant did not prove that Winstead did any of these things.
For the reasons above, the trial court committed no error in concluding that Grant did not produce a scintilla of evidence to support his claims; therefore, the judgment notwithstanding the verdict is affirmed.
AFFIRMED.
TORBERT, C.J., and FAULKNER, EMBRY and ADAMS, JJ., concur.
[1] For convenience of reference, we shall refer to positions taken by Grant's executrix as though taken by Grant himself.
[2] Snook died in 1973 and Adams in 1974. The corporation purchased their shares and held them as treasury shares.
[3] The Board of Directors had terminated Braswell's employment with the company in August 1976, so his shares were not involved in this transaction.
[4] The book value at the time was several times more than what Grant received.