Plaintiffs Williams and Gay brought an action claiming damages for breach of warranty and fraud against Fountain-Lowrey Enterprises, Inc., d/b/a Big 4 (hereinafter referred to as Big 4), and Citicorp Homeowners, Inc. (Citicorp); Big 4 brought a third party complaint against Boulder, Inc., who manufactured the mobile home involved, seeking indemnification if breach of warranty was shown against Big 4. Summary judgment was granted in favor of Boulder on the fraud claim before trial. Big 4 argues that the trial court erred in denying its motions for directed verdict on a breach of warranty and fraud claim involving the sale of a mobile home. We affirm.
The jury returned a $688.00 verdict in favor of the plaintiffs/buyers and against the defendant/seller, Big 4, on the breach of warranty claim and $22,500.00 on the fraud claim. It awarded the mobile home to Citicorp, which held a security interest in the same. The jury returned a verdict in favor of Boulder on the breach of warranty claim.
Because we must decide whether the court erred in denying Big 4's motions for directed verdict, we must examine the evidence offered by the plaintiffs in support of their claims. It includes the following:
Pamela Williams (Williams) and Wayne Gay were divorced in September of 1979. After the divorce, Williams decided to move from Alexander City, Alabama, to Andalusia, Alabama, and she began to shop for a mobile home. Williams went to the Big 4 mobile home lot, and talked to salesperson Nelda Godwin. Williams looked at several mobile homes and then came back several days later, and finally selected the one she bought. Williams was informed by Nelda Godwin that, since she was not working, had no income and no credit in her name, Nelda Godwin could not get her approved *Page 583 
for financing unless she could get a relative to sign with her. Williams thereafter brought in Wayne Gay with her to sign a credit application for purposes of closing the transaction and for approval of the loan. Williams and Gay purchased the new 1979 Boulder mobile home on October 31, 1979, and signed the Alabama Mobile Home Retail Installment Contract on that same date.
Nelda Godwin told Williams that the mobile home was a fine one. Williams's two minor daughters and one minor son were to, and did, live in the mobile home with her. After Williams made the down payment, she returned to Alexander City, Alabama, and the next time she saw the mobile home, it was set up by Big 4 on her lot in rural Covington County. It had been wrecked; the paneling on the side was torn loose and there were streaks down the side. In the first bathroom, the commode was torn completely out of the floor and the tank lid was chipped. The paneling in one of the windows in the living room was broken loose and bowed out. The commode in the master bathroom was partially pulled out, and the tank lid was broken. The back door was bent and a crack appeared around the top. Williams said that she could see the ground through a crack in the master bedroom.
After seeing her wrecked mobile home, Williams immediately went to the Big 4 office and lot in Andalusia, Alabama, and spoke to their agent, Nelda Godwin. Williams told Nelda Godwin that her trailer was a total wreck. Williams told Nelda Godwin what had to be fixed and how badly it was damaged and all that she had seen wrong with the mobile home. Nelda Godwin, agent of Big 4, told Williams she would have everything fixed to Williams's specifications if Williams still wanted the trailer. Williams testified that that statement of Nelda Godwin caused her to continue with the mobile home. Also, based on that representation of Nelda Godwin, Williams said she signed some more papers on the Big 4 mobile home lot that day.
Bobby Whatley witnessed Big 4 attempting to deliver and set up the mobile home (the mobile home was to be set up just across a road from his house). It was brought out to the lot by some Big 4 people. Bobby Whatley was standing in his front yard the day the mobile home was being delivered and saw it coming down the public road about a quarter mile from his house. The Big 4 employees who were delivering the mobile home got it tangled in some overhanging limbs, and tore the edge of the home, and then they hung it on a stump. The Big 4 employees "gunned" the truck back and forth with the mobile home attached, trying to get it off the stump. While this was going on, one of the Big 4 employees present told Bobby Whatley he had not slept in two days. Bobby Whatley testified the floor of the mobile home was "ruffled" where the stump hit it. The Big 4 employees cut the stump with a chain saw and then pulled the mobile home through the bushes and trees and tore the top when they did that. After the Big 4 employees finally set up the trailer on Williams's lot, Bobby Whatley noticed that the back door was warped. He observed the Big 4 employees trying to shut the mobile home door that was warped. He asked them how they were ever going to get it straightened out, and they told him Big 4 would put in a new door. The new door was never put in. After Williams moved into this mobile home, Bobby Whatley went over to visit her. It was raining, and he observed water in one of the living rooms, even running into the kitchen. It was coming from the wall and there was so much water that it could not be gotten up with a mop.
Williams testified that Big 4's agent, Nelda Godwin, told her that everything would be fixed to her specifications if she would keep the trailer, sign additional papers and pay for it, but it was never repaired and certainly never repaired to Williams's specifications.
Nelda Godwin testified that the total of payments agreed to by Williams and Gay for the mobile home was $27,567.36. The mobile home was delivered by Robbin Davis, an employee of Big 4 who was later *Page 584 
fired or quit. He and another Big 4 worker delivered the same mobile home that Williams had purchased. On the afternoon of delivery, Robbin Davis told Nelda Godwin that he hit a stump with the mobile home while delivering it. After Williams had lived in the mobile home a few days, she told Nelda Godwin that the back door did not fit well and that it rained in under that door. The back door was never repaired, and the replacement door was left lying in the back yard of the house, where it remained on the day of trial.
Johnny Godwin testified that he was employed by Big 4 as general manager and manager of the Andalusia, Alabama, lot. He went out and looked at the lot where the mobile home was to be installed and set a date for delivery with Big 4's Brewton, Alabama, office. He knew Big 4 employees wrecked the mobile home on a stump and he knew where the lot was, but he never personally went back to the lot or to the site of the mobile home after it was delivered and wrecked by Big 4.
Johnny Godwin testified that he was aware that the back door on the mobile home was warped and did not fit in January of 1980. He testified that he knew the back door never had been repaired or replaced. Johnny Godwin knew that it had rained in the warped back door, that there was a weak spot in the floor by the back door, and that the floor had begun to rot. He knew that this rotting would happen after the floor had continuously been wet. Big 4 never repaired the back door, even though Williams came by his office and made numerous complaints. Johnny Godwin was aware that rain was still coming in the back door, that the floor was damaged, and that there was a weak spot in the floor; however, he personally never did anything about it even though his wife, Nelda Godwin, had promised Williams that the mobile home would be repaired to Williams's specifications.
After Williams reported the problems with the wreck to Nelda Godwin at Big 4, three weeks went by before she could move into the mobile home, because the power company would not connect electricity because the bathrooms were torn up. The shower was leaking and water was running into her son's bedroom. The water would not drain out of the bathtub in the master bedroom. Big 4 employees cut her insulation. Williams reported the problem to Nelda Godwin at Big 4, but it was never corrected. A repairman brought a door that would not fit. He brought it in a pouring rain. The repairman took the warped door off, put on the other one, which did not fit, and then put the warped door back on the mobile home and stood the new door up beside the mobile home and left. That left Williams with the old door that had leaked all along. This repairman, sent at Big 4's direction, told Williams that he would be back the next day, but she never saw him again. Then, Mr. Fountain, an officer of Big 4, sent another repairman out to the mobile home, and he told Williams he would not fix the door because it was wrecked. He told Williams, "I know you have heard this before, but I'll be back tomorrow." Williams has never seen him since, either. Williams contacted the Andalusia Area Chamber of Commerce for help. She wrote the Consumer Protection Agency in Montgomery, Alabama, for help. She went by the corporate headquarters of Big 4 in Brewton, Alabama, and talked to the corporate officers and told them they had not fixed her back door and the floor was rotting out because it was still raining in every time it rained. Finally, Williams moved out of the mobile home because she was frightened for her children, afraid they would fall through the hole that had rotted by the door. Before she moved out of the mobile home, she fell through the hole at the back door, just inside the back door. The floor fell through and, if she had not been holding onto the door, she would have hit the ground. Her children had to change schools because of her having to move.
We cannot agree with Big 4 that it was entitled to a directed verdict on the plaintiffs' fraud count. The plaintiffs put on evidence from which the jury could conclude that Big 4's agents misrepresented to *Page 585 
Williams a material fact, which false representation was relied upon by Williams, who suffered damage as a result. Specifically, there was evidence to support a jury's determination that Big 4, subsequent to the sale, misrepresented that it would fix the damaged mobile home to Williams's specifications. This being so, the trial court correctly denied Big 4's motion for directed verdict.International Resorts, Inc. v. Lambert, 350 So.2d 391 (Ala. 1977).
The trial judge charged the jury correctly on the fraud claims, as follows:
 "[F]irst, there must be a false representation made by the Defendant or the seller, usually. Two, the false representation must concern a material existing fact. The person or the Plaintiff, normally, the person to whom that misrepresentation is made, must rely upon it. . . . And the Plaintiff must be damaged as a proximate result of the action. That is, the false representation.
 "Now, to that, ladies and gentlemen, you are talking about a normal situation, the damage for which is compensatory. . . . If you are reasonably satisfied by the evidence that the Defendant was guilty of legal fraud as charged by the Plaintiff and that the Plaintiff was damaged or injured thereby, the Plaintiff would be entitled to recover for such actual damage as you may find [from] the evidence, that he or she did suffer.
"Actual damage, that means compensatory damage. . ..
 ". . . And it is said in addition to actual damages, the law authorizes a jury to award exemplary or punitive damage as I have defined to you, in fraud and deceit actions if it [is] shown [to the] reasonable satisfaction [of] the jury by the evidence that the fraud was malicious, oppressive and gross or a misrepresentation made with knowledge of its falsity or so recklessly done as to amount to the same thing and committed with the intent to injure or defraud."
Big 4 argues simply that the evidence failed to establish any evidence supporting actionable deceit which would support either compensatory or punitive damages. Its argument is that the plaintiffs failed to establish a prima facie case and that the trial court erred in submitting the fraud claim to the jury "for compensatory damages, but certainly on the issue of punitive damages."
We cannot agree. The evidence in this case runs to several hundred pages, making up six volumes. It was in conflict in some, but not all, respects. Basically, Big 4 denied making the statements attributed to it by the plaintiffs' testimony or contended that the mobile home had been repaired. It clearly was not a case for a directed verdict for either side.
Finally, Big 4 argues that the amount of damages awarded on the fraud claim, $22,500, was excessive. Williams, on the other hand, argues that it was insufficient — although she did not cross appeal. The jury originally returned a verdict in favor of Williams and Gay in the amount of $25,000. When the trial judge read it to the jury and inquired whether it was unanimous, one or more of the jurors pointed out that it was wrong. The jury returned to the jury room and returned a general verdict in favor of Williams and Gay for $22,500. Williams and Gay argue that they were not entirely compensated for their loss by this amount.
The $22,500 verdict was a general one, and we cannot say that it is entirely punitive. The jury found in favor of Citicorp on its detinue claim and awarded the trailer to Citicorp. It found in favor of Gay and Williams on Citicorp's suit on the full amount due on the note for the remaining balance due, and against Big 4 for $22,500 on the fraud claim. It found in favor of Boulder on Big 4's third-party complaint. Suffice it to say that the jury was properly charged on all elements of the case, and that there was evidence to support the several verdicts it returned. We find no error and, thus, the judgment appealed from is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and BEATTY, JJ., concur. *Page 586