This case raises several issues relating to the disposition of attorneys' fees under a series of fee-sharing agreements between lawyers representing common clients. Upon settlement of a medical malpractice case for Regina Abernathy, a minor, the lower court determined that, of the $125,000 settlement, reasonable attorneys' fees were $41,662.50; sustained FNBT's garnishment against such funds to the extent of B.T. Gardner, Jr.'s share of the fees; reduced by one-third the costs and expenses claimed by Regina Abernathy's lawyers; and ordered that $500 be paid to an expert who had been previously compensated for his services.
Lewis, Wilson, Lewis, Jones (LWL J), a Virginia law firm entitled to share in the attorneys' fees, appeals, contending, in essence, that, under fee sharing arrangements in several cases, Gardner owed them a sum in excess of any amount he was entitled to from the Abernathy settlement alone; therefore, LWL J argues, Gardner was not entitled to share in the attorneys' fees accruing from the Abernathy case, thereby making garnishment of any portion of the allotted attorneys' fees by Gardner's creditor, FNBT, improper. LWL J also contends the court erred by arbitrarily reducing claimed costs and expenses, and by requiring payment to an expert witness previously paid by LWL J.
Although we find no evidence to support the reduction in claimed costs and expenses or the additional payment to the expert witness, we find sufficient evidence to support the disposition of attorneys' fees ordered by the lower court. Therefore, we reverse the trial court's order requiring a one-third reduction in claimed costs and expenses and payment of $500 to the expert witness. We affirm, however, the trial court's disposition of the settlement proceeds.
 THE ISSUES
No question arises on appeal regarding the total amount of the settlement fund set aside for attorneys' fees; nor does any question arise as to other allocations from the fund, such as guardian ad litem fees or reimbursements to the minor's parents. Our review is limited to an examination of: 1) the division of attorneys' fees among the lawyers participating in the case; 2) the garnishment by FNBT of the fee share to which Gardner was entitled, if any; 3) the reduction of itemized costs and expenses; *Page 22 
and 4) the double payment to the expert witness.
 THE FEE DISBURSEMENT ISSUES
In order to understand the respective arguments advanced by the parties concerning the fee allocation, we must understand the relationship between Gardner and LWL J. In 1977, Gardner was representing plaintiffs, under contingent fee contracts, in four medical malpractice cases. Because Gardner felt he needed help in handling these cases, Gardner made an arrangement with LWL J pursuant to which Gardner would continue to act as local counsel, while principal responsibility for preparation and trial of the cases was turned over to LWL J. They agreed to divide whatever fees were earned from these cases.
The fee-sharing arrangements between LWL J and Gardner went through several stages. First, the parties operated under a letter agreement to share fees one-third to Gardner, and two-thirds to LWL J. In May 1978, Gardner's financial situation worsened and LWL J began to make advances to Gardner to fund the operation of Gardner's law office. A letter from LWL J dated June 7, 1978, undertook to state the terms on which these funds were advanced:
 "It is our understanding that this sum . . . is a demand loan from this firm to your firm. In the event that our respective firms are able to enter an agreement concerning a joint-venture type relationship for the several medical malpractice and personal injury cases for which you have sought our assistance, then these sums mentioned herein shall be considered an advance to you and are to be subtracted from your portion of the attorney fees."
Thereafter, LWL J prepared a comprehensive joint-venture agreement covering the details of their arrangement with Gardner, and sent the final draft to Gardner in September 1980. Under this agreement, Gardner was to devote at least 80% of his total billable time to the joint-venture cases; LWL J was to fund the operation of Gardner's law office to the extent of approximately $5,500 per month; and Gardner's share of anticipated fees was reduced from one-third to five percent, while LWL J's share was increased from two-thirds to ninety-five percent. Significantly, the agreement further provided that Gardner was not to repay LWL J's advances if the joint venture failed to realize a profit.
Gardner executed and returned the agreement, although he raised questions as to the ethical propriety of some provisions. While LWL J never formally executed the agreement, and some provisions remained blank, the record shows both firms operated in accordance with at least some of the agreement's major provisions from June 1978 through November 1978. For example, Gardner devoted substantially all of his time to the joint venture cases and submitted weekly time reports to LWL J. In turn, LWL J advanced funds totalling over $38,000 for the operation of Gardner's office in amounts contemplated by the agreement.
When the first case tried under the joint-venture agreement produced no recovery, LWL J stopped making advances, Gardner stopped submitting time reports, and neither LWL J nor Gardner operated under the joint-venture agreement thereafter. No subsequent agreement was reached concerning reimbursement of the advances.
The parties to this appeal strongly dispute the effect of this joint-venture agreement on the ultimate respective fee shares of LWL J and Gardner from the Abernathy settlement. LWL J contends: 1) the document which purports to be a joint-venture agreement was merely a draft proposal which was never validly executed, and thereby never governed the relationship between the parties; 2) all payments made to Gardner were demand loans which the parties anticipated would be repaid from Gardner's portion of the fees to be earned in one or more of the malpractice cases.
On the other hand, FNBT contends: 1) the joint-venture agreement became valid upon Gardner's signing and return of the *Page 23 
document to LWL J; 2) the agreement lasted until the first case was tried, yielding no recovery, and this abandonment did not change the status of the advances made under the agreement while it was in effect; 3) monies advanced to Gardner in connection with the other cases were capital contributions to the joint venture rather than demand loans, and were swallowed up in the agreement; and 4) attorneys' fees generated by the Abernathy settlement were available for Gardner's one-third participation, this percentage being reasonable, and therefore subject to garnishment.
After close examination of the evidence appearing of record, we are convinced sufficient evidence existed from which the trial court could conclude: 1) a joint-venture agreement existed which controlled the reimbursement of advances made pursuant to that agreement; 2) that conditions prescribed by the agreement under which LWL J might be entitled to receive reimbursement for the advances made have not materialized, abandonment of the agreement notwithstanding; and 3) that Gardner's appropriate share of the Abernathy fee is one-third, no other agreement between LWL J and Gardner having been reached before FNBT's garnishment attached.
Even if we assume, arguendo, that, as LWL J contends, a debtor/creditor relationship existed as to the advance payments made to Gardner, we perceive no reason why LWL J should be in a favored disbursement position over FNBT, also a creditor, who garnished Gardner's share of the fee in aid of judgment. The parties to this appeal fail to clearly delineate the sequential analysis necessary to determine appropriate fee distribution. First, Gardner is entitled to some fee from the Abernathy settlement alone based on some agreement between the parties. This entitlement does not disappear or change just because Gardner may owe more than this amount from prior advances in other cases.
The following hypothetical situation will illustrate the point: A loans B $200, and B promises to repay this loan from lottery proceeds if B wins in the state lottery; B wins $150 in the lottery. B would still be entitled to $150 from the state, although he owes this sum to A. Thus, if both FNBT and LWL J loan money to Gardner prior to his bankruptcy, we see no reason why they should not be on equal footing regarding repayment of debt from income to which Gardner is entitled, absent garnishment of that income. Because FNBT garnished Gardner's income first, in April 1982, priority attaches from that date and cannot be impaired by subsequent agreement between Gardner and LWL J whereby Gardner disclaimed any interest in the funds available for distribution.
 THE EXPENSE AND COST ITEMS
The guardian ad litem raised no specific objections to any individual item of expense, but did raise a general objection that the expenses seemed too high. Unless there is a specific objection to an expense item, the court ordinarily should approve the item. The burden of proving correctness of items shifts to the party claiming them only after objections have been filed to specific items. See Hines v. Baldwin, 211 Ala. 322,100 So. 466 (1924). An examination of the ledger sheets submitted to the lower court reveals that the claimed expenses are of the variety considered appropriate for reimbursement,i.e., travel expenses, copying costs, filing fees, etc.
FNBT does not take issue with LWL J's contentions relating to expenses, nor does FNBT address the double payment of $500 to the expert witness, which was obviously an oversight of the court. Clearly, the trial court erred by ordering this payment after it had been paid.
The judgment is due to be, and hereby is, affirmed as to the disbursement of attorneys' fees, and reversed as to the one-third reduction of expenses and the $500 overpayment.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
TORBERT, C.J., and MADDOX, SHORES and BEATTY, JJ., concur. *Page 24