832 So.2d 44 (2001)
HORTON HOMES, INC., and Southern Manufactured Homes, Inc.
v.
Scott BROOKS.
1000346.
Supreme Court of Alabama.
November 30, 2001.
*46 Matthew W. White of Walker, Hill, Adams, Umbach, Meadows & Walton, Opelika; and Martin L. Fierman, Eatonton, Georgia, for appellants.
G. Houston Howard II of Howard, Dunn, Howard & Howard, Wetumpka, for appellee.

On Applications for Rehearing
HOUSTON, Justice.
The opinion of July 13, 2001, is withdrawn and the following is substituted therefor.
In July 1998, Scott Brooks sued Southern Manufactured Homes, Inc., and Horton Homes, Inc. (hereinafter together referred to as "Horton Homes"), seeking damages based on claims that arose out of his purchase of a manufactured home. The case proceeded to trial, and the jury awarded Brooks compensatory damages of $150,000 and punitive damages of $600,000.
Horton Homes appeals from the judgment entered on the jury's verdict, raising several issues: (1) whether the trial court erred in allowing the breach-of-implied-warranty claim to go to the jury; (2) whether the court erred in allowing the wanton-repair claim and the related punitive-damages issue to go to the jury; (3) whether the court erred in allowing Brooks's attorney to question the Horton Homes representative about other lawsuits and consumer complaints that had been filed against Horton Homes; (4) whether the $150,000 award of compensatory damages was excessive; (5) whether the court erred in assessing, against Horton Homes, attorney fees in the amount of $34,612.50 and costs in the amount of $5,340.03; and (6) whether the $600,000 award of punitive damages was excessive.
In August 1997, Brooks specially ordered a manufactured home from Factory Direct Homes, Inc. ("Factory Direct Homes"), a dealer in Montgomery. Horton Homes manufactured the home for Brooks. In September 1997, the home was delivered. Brooks executed a purchase contract and financed the purchase of the home. The purchase price was $63,414.90.
In October 1997, Brooks and his family moved into the home. They immediately began experiencing problemsfor example, water from the washer would back up into the kitchen sink when it was discharged *47 from the washer; water dripped under the house; floors were not level; and the shower stalls cracked. Additional problems soon developedwhen the kitchen cabinets began to warp and come apart, Brooks investigated and found that the dishwasher was leaking because a hole had been drilled through it; the floor buckled near the washer; plasterboard and floor covering in the utility room turned different colors; water leaked in the wall between the kitchen and the utility room; and the furnace was leaning.
Brooks reported the problems to Factory Direct Homes, which corrected some of the problems (replacing the shower stalls and the dishwasher) and attempted to correct the other problems. In the spring of 1998, Factory Direct Homes went out of business, and in early May 1998 Brooks contacted Horton Homes directly regarding the problems he was continuing to have with the home. On two occasions (May 30, 1998, and June 20, 1998), Horton Homes sent service crews to the Brooks home to correct the problems. However, the service crews were unsuccessful in completing the necessary repairs, and, in fact, according to Brooks's testimony, the home was in worse condition after the service crew left on June 20, 1998, than when they arrived.
Brooks testified that when he arose on the morning after the repairs, i.e., on Sunday, June 21, 1998, which was Father's Day, furnishings were still where the service crew had moved themthe kitchen table was still in the den, the refrigerator was still in the dining room, and the freezer was still outside. He said that the dishwasher no longer worked because it had been damaged when a cabinet fell on it; that the stove had a gas leak; that canned goods were stacked on the kitchen counters; that the new floor covering was wrinkled and had big gouges around the perimeter; that the new flooring was soft and that a hole had been accidentally drilled in the new flooring and had been filled with wood putty; that the trim had not been replaced; and that debris was stacked by the side of the house. Brooks testified that he telephoned Horton Homes on several occasions, but that no one returned to complete the repairs that were begun on June 20, 1998, until after he had sued.
On July 14, 1998, Brooks filed a multicount complaint against Horton Homes.[1] After a trial, the jury awarded damages to Brooks, and the trial court entered a judgment on the verdict. The case was submitted to the jury on the breach-of-express-warranty, breach-of-implied-warranty, and wanton-repair claims.[2] The verdict form the jury returned stated:
"We the jury find the issues in favor of the plaintiff Scott Brooks and against the defendants Southern Manufactured *48 Homes, Inc., and Horton Homes, Inc., and assess the plaintiff's damages at $150,000 compensatory and $600,000 punitive."
The court denied Horton Homes' motion for a judgment as a matter of law. This appeal followed.
First, Horton Homes contends that the trial court erred when it allowed the breach-of-implied-warranty claim to go to the jury. Generally, implied warranties apply only to the seller, not the manufacturer. See Ex parte General Motors Corp., 769 So.2d 903, 910 (Ala.1999). However, implied warranties can apply to the manufacturer when, as in this case, the product has been specially manufactured for a particular customer and the manufacturer can reasonably expect the customer to be affected by any problems with the product. See Liberty Homes, Inc. v. Epperson, 581 So.2d 449, 453 (Ala.1991). The evidence indicates that Brooks specially ordered the manufactured home and that his name appeared on the paperwork that accompanied the home as it moved along the manufacturing line.
In its "Limited One-Year Warranty" contained in the "Home Owner's Manual," Horton Homes, by conspicuous language, purported to exclude all implied warranties.[3] Horton Homes argues that this fact distinguishes the present case from Epperson because, it says, in Epperson the manufacturer did not exclude any implied warranties. However, while the Epperson opinion, 581 So.2d at 453, notes that the "Home Owner's Manual" included a limitation of warranty, it does not indicate the wording of that limitation of warranty. Therefore, Epperson does not indicate whether the manufacturer excluded implied warranties. Additionally, no issue regarding the effect of an exclusion of implied warranties on Epperson's claim alleging breach of implied warranties was raised or addressed in this Court's opinion in Epperson.[4]
The issue we now must address is whether Horton Homes' purported exclusion of implied warranties in the "Limited One-Year Warranty" contained in the "Home Owner's Manual" precludes Brooks's breach-of-implied-warranty claim. In the portion of his complaint alleging a breach of implied warranty, Brooks referred to 15 U.S.C. § 2308(a), a portion of the Magnuson-Moss Warranty Act:[5]
*49 "§ 2308. Implied warranties
"(a) Restrictions on disclaimers or modifications
"No supplier may disclaim or modify (except as provided in subsection (b) of this section) any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product, or (2) at the time of sale, or within 90 days thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product."
(Emphasis added.) The term "written warranty" is defined in 15 U.S.C. § 2301(6):
"(6) The term `written warranty' means
"(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time....
"....
"which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product."
In this case, Brooks specially ordered a double-wide manufactured home. When Horton Homes manufactured this home for Brooks, in September 1997, its policy was for the production-line manager and the final-finish supervisor on the line where the home was manufactured to sign a "Certificate of Quality Assurance"; that certificate included the statement "Your new home has been carefully inspected to ensure quality and cleanliness" and included the phrase "Built for a Lifetime!" This certificate was also signed by the cleaning-crew supervisor and by crew members.
Horton Homes manufactured Brooks's home on September 2, 1997. On that date, two "Certificates of Quality Assurance" were signed for the Brooks home (one for each section of the double-wide), and they were placed on the kitchen counter of the home. The first time Brooks saw the home was approximately September 8, 1997, when the home was delivered to his lot. Brooks testified that when he entered the kitchen, he saw the certificates and read them and that he relied on the certificates when he executed the paperwork to purchase the home. Brooks testified that if he had known that the production-line manager had signed the certificates in blank, he would have made further inspection before purchasing the home. Thus, we conclude that these "Certificates of Quality Assurance" are "written warranties" within the meaning of the Magnuson-Moss Warranty Act and that Horton Homes' purported disclaimer of implied warranties is ineffective.[6] Therefore, the trial court properly submitted the breach-of-implied-warranty claim to the jury.
Second, Horton Homes contends the trial court erred when it submitted to the jury the wanton-repair claim. The basis for this contention is Horton Homes' argument that Brooks is not entitled to *50 recover damages for mental anguish under a wanton-repair claim because the only "injury" was to the product itself and Brooks failed to show that he suffered "a physical injury as a result of [Horton Homes'] negligent conduct, or [that he was] placed in immediate risk of physical harm by that conduct." Ex parte Grand Manor, Inc., 778 So.2d 173, 179 (Ala.2000).
However, even if Horton Homes' argument concerning mental-anguish damages under the wanton-repair claim is correct (a point on which we express no opinion), it would not follow that it was error to submit the wanton-repair claim to the jury. Given the general verdict form, there is no basis to believe that any mental-anguish damages were awarded under the wanton-repair claim as opposed to the breach-of-warranty claims.[7]
Third, Horton Homes contends the trial court erred when it permitted Brooks to question Jimmy Dean Holton, Horton Homes' representative, about other lawsuits and consumer complaints filed against Horton Homes. At trial, the following exchange occurred between Holton and Brooks's attorney:
"[BROOKS'S ATTORNEY]: ... [Horton Homes] state[s] that if this home is shown to contain a defect or malfunction, [Brooks] did not allow [Horton Homes] a reasonable number of attempts to remedy said defects.
"Is that Horton's position in this litigation?
"[HOLTON]: Response is probably indicated because we were not allowed to continue to try to solve his problem, and he refused service on July 17, I think.
"....
"[BROOKS'S ATTORNEY]: Sir, my question is simply, is it Horton's position in this case that, quote, if the home is shown to contain a defect or malfunction, [Brooks] did not allow [Horton Homes] a reasonable number of attempts to remedy said defects?
"[HOLTON]: Yes.
"....
"[BROOKS'S ATTORNEY]: How long does Horton contend that Mr. Brooks should have continued to wait for Horton to solve his problems?
"[HOLTON]: Well, from the time we got involved in it, we only had something like May 5 towe had vacation. I mean, under 50 days, I think it was.
"[BROOKS'S ATTORNEY]: How much longer beyond July 14, 1998, do you contend Mr. Brooks should have continued to wait?
"[HOLTON]: I don't have an answer for that."
Thereafter, the parties and the trial court held an extensive discussion on the record, but outside the presence of the jury, on Horton Homes' motion in limine, seeking to exclude evidence of other lawsuits or complaints filed against Horton Homes. The trial court ruled that there was probative value to allowing Brooks to question the Horton Homes' corporate representative about the number of other lawsuits and complaints similar to Brooks's and concluded that that ruling was supported by Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 515-16 (Ala. *51 2000).[8] Horton Homes excepted to this ruling.
Although Horton Homes excepted to the trial court's ruling denying its motion in limine, it did not object when Brooks questioned Holton regarding other lawsuits and complaints. The following exchange occurred while Brooks questioned Holton:
"[BROOKS'S ATTORNEY]: How many times has Horton been sued for failure to repair defects in homes that customers request?
"[HORTON HOMES' ATTORNEY]: Your Honor, we have a stipulation that there have been 185 lawsuits in which Horton was named and I talk collectively, Southern/Horton, were named in which there was an allegation of a repair that was not complete or not properly done.
"THE COURT: Ladies and gentlemen, I told you earlier and I'll tell you again now that a stipulation stands as a proven fact that requires no further proof. So counsel for [Horton Homes] has stipulated that 185 lawsuits have been filed against this company for failure to effect repairs or to do warranty work. Is that right?
"[HORTON HOMES' ATTORNEY]: That was the allegations, that's right.
"....
"[HORTON HOMES' ATTORNEY]: Excuse me, Your Honor. Our stipulation, what we were asked to do is determine within the last five years. And that is the number that represents the last five years.
"[BROOKS'S ATTORNEY]: That was the next question that I was going to ask him.

*52 "[HORTON HOMES' ATTORNEY]: Our stipulation is that with regard to these named companies collectively, 185 lawsuits alleging warranty issues within the last five years, which was the time frame the Court gave us.
"THE COURT: Correct.
"....
"[BROOKS'S ATTORNEY]: Now, in each state is there an administrative agency that enforces the regulations of the Department of Housing and Urban Development concerning manufactured homes?
"[HOLTON]: Yes.
"[BROOKS'S ATTORNEY]: Do those agencies typically receive complaints from consumers about problems they have with manufactured homes?
"[HOLTON]: Yes.
"[BROOKS'S ATTORNEY]: And within the last five years, how many complaints have been filed against Horton Homes and Southern Manufactured Housing just in the state of Alabama?
"[HORTON HOMES' ATTORNEY]: Your Honor, I don't believe we addressed that. We provided those to [Brooks's attorney]. Do you have a number? Do you know how many there are we gave you?
"[BROOKS'S ATTORNEY]: I have a list of what was provided.
"THE COURT: Let's just test the witness's knowledge, which is what we're supposed to be doing here.
"[BROOKS'S ATTORNEY]: Do you know how many have been filed just in the State of Alabama within the last five years where there is an allegation of failure to make repairs?
"[HOLTON]: No, sir.
"THE COURT: Now, is there a stipulation?
"[HORTON HOMES' ATTORNEY]: If [Brooks's attorney] knows what the number is that we gave him, I'll take his number. The number we come up with is 53. Once again, what the Court asked us to do was produce the last five years of those, and there are 53 of those.
"THE COURT: So stipulated.
"[HORTON HOMES' ATTORNEY]: Once again, where there was an issue raised about repair."
Additionally, Brooks asked Holton if Horton Homes had, within the five-year period before September 1997, received any complaints that alleged the repair crews had actually done additional damage when attempting to make repairs. Holton answered, "Not to my knowledge." Then Brooks displayed, by an overhead projector, two complaints that contained such allegations, and Horton Homes did not object. In Odom v. Schofield, 480 So.2d 1217, 1218 (Ala.1985), this Court stated:
"We have held previously that a movant who receives an adverse ruling on a motion to exclude evidence, made in limine, preserves the adverse ruling for post-judgment and appellate review only if he objects to the introduction of the evidence when it is offered at trial, and if he assigns specific grounds for the objection."
Thus, Horton Homes failed to preserve this issue for review.
Fourth, Horton Homes contends that the award of $150,000 in compensatory damages was excessive. Unrefuted evidence indicated that if Horton Homes made approximately $12,000 in repairs then the problems with Brooks's manufactured home (those that were caused by, or were the responsibility of, Horton Homes) *53 would be cured.[9] Horton Homes contends that the $150,000 award must have included an award of $138,000 for mental anguish, and that such an award was excessive.
However, in Washington, 774 So.2d at 518-19, this Court affirmed an award of $375,000 in compensatory damages based on the plaintiff Washington's purchase of a custom-built mobile home for $19,320. This Court stated, "Evidence indicating that Washington experienced such feelings [as he had testified to] over such an extended period supports the jury's finding of mental anguish under the standard established in [Kmart Corp. v. Kyles, 723 So.2d 572, 578-79 (Ala.1998)]." 774 So.2d at 519. In Kmart Corp. v. Kyles, 723 So.2d at 578, this Court stated:
"Under Alabama law, the presence of physical injury or physical symptoms is not a prerequisite for a claim for damages for mental anguish. `The plaintiff is only required to present some evidence of mental anguish, and once the plaintiff has done so, the question of damages for mental anguish is for the jury.' The amount of the jury's award is left to the jury's sound discretion, and the jury's award will not be set aside absent a clear abuse of discretion. Also, a jury's verdict is presumed correct, and that presumption is strengthened by the trial court's denial of a motion for new trial. But, here we must address the strength of the presumption in light of the plaintiff's failure to testify about the nature of her alleged mental anguish.
"....
"We now clearly allow the testimony of a witness as to his or her mental anguish. The question thus remains, in the present era, when we permit a witness to offer evidence as to the witness's own mental anguish, is indirect evidence of mental anguish alone sufficient to support a substantial verdict? We answer this question in the negative. We give stricter scrutiny to an award of [mental-anguish damages] where the victim has offered little or no direct evidence concerning the degree of suffering he or she has experienced."
(Citations omitted.)
Mental anguish includes anxiety, embarrassment, anger, fear, frustration, disappointment, worry, annoyance, and inconvenience. Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301, 1307 (Ala.1991); B & M Homes, Inc. v. Hogan, 376 So.2d 667, 673 (Ala.1979). At trial, Brooks testified to the following:
"Q. Scott, what effect has this had on you personally?
"A. It's been very stressful.
"Q. In what way?
"A. Well, just a fear that I'm going to be stuck with this situation thatYou know, when I first started talking to the dealer, they were saying, `Don't worry Mr. Brooks, we're going to take care of it.' And I went eight months with them. And the same things that they did, the factory came in and started doing. It was just a repeat. They didn't even see anything wrong with the way they were putting my floor down. I can't live with it like that. I mean, this was a brand new house. I bought a brand new house. I paid a substantial amount of money for this house.
"Q. How much did the house cost?
*54 "A. It was $63,000.
"Q. Go ahead.
"A. And I wasI felt like I was getting jerked around by these people. All I asked them to do was fix my house. I didn't ask for four of them to take ten months to fix my house. It didn't matter to me if the people did it or the factory did it. All I wanted was my house to be repaired so I could go on with my life. It was very stressful ...
"Q. Have you lost any sleep about this?
"A. Yes, sir, I have.
"Q. Have you cried?
"A. Yes, sir, I have.
"Q. Do you feel like that they dealt with you honestly in what
"A. No, sir, I do not."
At trial, Brooks's wife testified that Brooks "was a nervous wreck" and "stayed stressed out" and "[got] edgy about stuff." She stated that he would get up at 2:00, 3:00, or 4:00 in the morning and just sit on the couch and that when she would get up and ask him what was wrong he would tell her that "he didn't know what [they] were going to do" because "[they had worked] very hard for what little bit [they did] have and he just didn't know ... if [they were] going to have to end up fixing it [themselves] or what." Brooks's wife also testified that when they would have guests over to their home, Brooks "would just get real upset and you could see tears in his eyes and sometimes running down his face" when they would begin talking about the problems with the home. Thus, we conclude that Brooks presented sufficient evidence to justify the jury's award of approximately $138,000 in mental-anguish damages. Washington, supra.
Fifth, Horton Homes contends the trial court erred in awarding $34,612.50 in attorney fees and $5,340.03 in costs. Brooks's attorney moved for an award of attorney fees and costs and filed a supporting affidavit. The Magnuson-Moss Act, 15 U.S.C. § 2310(d)(2), provides for the recovery of attorney fees for violation of written warranties:
"If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on the actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate."
Horton Homes filed nothing in opposition to this motion and affidavit and, at the hearing on the motion, Horton Homes did not specifically identify any work or expense claimed by the attorney that was unnecessary. Horton Homes bore the burden of objecting to specific items or charges for amounts for work that it considered improper, and when it declined to identify any work or expense that it considered unnecessary the trial court could properly treat those amounts as uncontroverted. See Lewis, Wilson, Lewis, & Jones, Ltd. v. First Nat'l Bank of Tuscumbia, 435 So.2d 20, 23 (Ala.1983); Costa & Head Dev. Co. v. Mayer Elec. Supply Co., 562 So.2d 1323, 1325 (Ala.Civ.App.1989). Thus, we find no abuse of discretion on the part of the trial court in awarding attorney fees in the amount of $34,612.50 and costs in the amount of $5,340.03.
Finally, Horton Homes contends that the $600,000 award of punitive damages was excessive. Horton Homes has properly challenged the constitutionality of the punitive-damages award as being a denial *55 of the due process guaranteed by the Fourteenth Amendment to the Constitution of the United States and Art. I, § 13, of the Constitution of Alabama of 1901; and as violating the "excessive-fines" provision of the Eighth Amendment of the Constitution of the United States and Art. I, § 15, of the Constitution of Alabama.
In Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. 1678, 1684-89, 149 L.Ed.2d 674 (2001), the United States Supreme Court wrote:
"Despite the broad discretion that States possess with respect to the imposition of criminal penalties and punitive damages, the Due Process Clause of the Fourteenth Amendment to the Federal Constitution imposes substantive limits on that discretion. That Clause makes the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishments applicable to the States. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam). The Due Process Clause of its own force also prohibits the States from imposing `grossly excessive' punishments on tortfeasors. [BMW of North America, Inc. v.] Gore, 517 U.S. [559,] at 562, 116 S.Ct. 1589, 134 L.Ed.2d 809 [(1996)]; TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 453-455, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (plurality opinion).
"The Court has enforced those limits in cases involving deprivations of life ... and deprivations or property....
"In these cases [cases cited in the preceding paragraph for the proposition stated there (but omitted from this quotation)], the constitutional violations were predicated on judicial determinations that the punishments were `grossly disproportional to the gravity of ... [the] defendant[s'] offense[s].' ... We have recognized that the relevant constitutional line is `inherently imprecise' ... rather than one `marked by a simple mathematical formula.' But in deciding whether the line has been crossed, we have focused on the same general criteria: the degree of the defendant's reprehensibility or culpability; the relationship between the penalty and the harm to the victim caused by the defendant's actions; and the sanctions imposed in other cases for comparable misconduct. Moreover, and of greatest relevance for the issue we address today, in each of these cases we have engaged in an independent examination of the relevant criteria.
"... `... [T]he question whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context de novo review of that question is appropriate.'
"... [I]n Ornelas [v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)], we held that trial judges' determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal. The reasons we gave in support of that holding are equally applicable in this case. First, as we observed in Ornelas, the precise meaning of concepts like `reasonable suspicion' and `probable cause' cannot be articulated with precision; they are `fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed.' Id., at 696, 116 S.Ct. 1657. That is, of course, also a characteristic of the concept of `gross excessiveness.' Second, `the legal rules for probable cause and reasonable suspicion acquire content only through application. Independent review is therefore necessary if appellate courts are to maintain control *56 of, and to clarify, the legal principles.' Id., at 697, 116 S.Ct. 1657. Again, this is also true of the general criteria set forth in Gore; they will acquire more meaningful content through case-by-case application at the appellate level. `Finally, de novo review tends to unify precedent' and `stabilize the law.' Id., at 697-698, 116 S.Ct. 1657. JUSTICE BREYER made a similar point in his concurring opinion in Gore:
"`Requiring the application of law, rather than a decisionmaker's caprice, does more than simply provide citizens notice of what actions may subject them to punishment; it also helps to assure the uniform treatment of similarly situated persons that is the essence of law itself.' 517 U.S., at 587, 116 S.Ct. 1589.
"Our decisions in analogous cases, together with the reasoning that produced those decisions, thus convince us that courts of appeals should apply a de novo standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards.

"III
"`Unlike the measure of actual damages suffered, which presents a question of historical or predictive fact, the level of punitive damages is not really a "fact" "tried" by the jury.' Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 459, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (SCALIA, J., dissenting). Because the jury's award of punitive damages does not constitute a finding of `fact,' appellate review of the District Court's determination that an award is consistent with due process does not implicate ... Seventh Amendment concerns....
"....
"Differences in the institutional competence of trial judges and appellate judges are consistent with our conclusion. In Gore, we instructed courts evaluating a punitive damages award's consistency with due process to consider three criteria: (1) the degree or reprehensibility of the defendant's misconduct, (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. 517 U.S., at 574-575, 116 S.Ct. 1589. Only with respect to the first Gore inquiry do the district courts have a somewhat superior vantage over courts of appeals, and even then the advantage exists primarily with respect to issues turning on witness credibility and demeanor. Trial courts and appellate courts seem equally capable of analyzing the second factor. And the third Gore criterion, which calls for a broad legal comparison, seems more suited to the expertise of appellate courts. Considerations of institutional competence therefore fail to tip the balance in favor of deferential appellate review.
"IV
"....
"We have made these comments on issues raised by application of the three Gore guidelines to the facts of this case, not to prejudge the answer to the constitutional question, but rather to illustrate why we are persuaded that the Court of Appeals' answer to that question may depend upon the standard of review. The de novo standard should govern its decision. Because the Court of Appeals applied a less demanding standard in this case, we vacate the judgment and *57 remand the case for further proceedings consistent with this opinion."
(Emphasis added.)(Some citations omitted.)
Previously, in reviewing claims that punitive-damages awards were excessive, we have given deference to the jury's award. "In remitting a punitive damages award, we must remit only that amount in excess of the maximum amount that a properly functioning jury could have awarded." Big B, Inc. v. Cottingham, 634 So.2d 999, 1006 (Ala.1993) (emphasis added). The Alabama Legislature in Act No. 87-185, Ala. Acts 1987, enacted what became Ala. Code 1975, § 6-11-23(a) ("No presumption of correctness shall apply as to the amount of punitive damages awarded by the trier of the fact.") and § 6-11-24(a) ("On appeal, no presumption of correctness shall apply to the amount of punitive damages awarded."). This Court declared these sections unconstitutional in Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414 (Ala.1991), with Maddox, J., dissenting, at 423-27; Houston, J., dissenting, at 427-35; and Steagall, J., dissenting, at 435-36. Today, 10 years later, relying on the United States Supreme Court's decision in Cooper Industries, this Court will begin applying the standard of review directed by the Legislature in 1987.
In applying the de novo standard of review to Horton Homes' constitutional challenge to the amount of the punitive-damages award, we must review the evidence and the law without deference to the jury's award or to the trial court's rulings. Black's Law Dictionary, pp. 94 ("appeal de novo") and 447 ("de novo") (7th ed.1999). In reviewing the punitive-damages award de novo, we note that the plaintiff had approximately $12,000 in actual economic loss; that he was awarded $150,000 in compensatory damages; and that we have affirmed that award. The plaintiff's attorney was awarded attorney fees of $34,612.50 and costs in the amount of $5,340.03, to be paid by the defendants, and we have affirmed those awards. Therefore, there is no need to have punitive damages as an augmentation of compensatory damages to cover the reasonable costs of litigation or in any way to compensate the plaintiff. The compensatory-damages award made the plaintiff whole.
Ala.Code 1975, § 6-11-21, as amended by Act No. 99-358, Ala. Acts 1999, became effective more than a year before this action was tried (June 27-30, 2000). Section 6-11-21(a), with exceptions not applicable in this case, provides that "in all civil actions where an entitlement to punitive damages shall have been established under applicable laws, no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or five hundred thousand dollars ($500,000), whichever is greater." The "effective date" of Act No. 99-358 was June 7, 1999, but § 4 of that Act, which was not codified, provided: "This act shall apply to all actions commenced more than 60 days after the effective date of this act."[10]
Horton Homes filed what it styled as "Renewed Motion for Judgment as a Matter of Law; or, in the alternative, Motion for a New Trial; or in the alternative, *58 Motion to Alter, Amend, or Vacate the Judgment; or in the alternative, Motion for Remittitur." In that motion it made the following argument:
"All claims for punitive damages are subject to the provisions of § 6-11-21, et seq., Ala.Code 1975, including but not limited to the statutory cap on punitive damages. See Goodyear Tire & Rubber Co. v. Vinson, [749 So.2d 393] (Ala.1999) (Hooper, C.J., concurring specially). The Alabama Supreme Court's action abolishing the legislatively created cap on punitive damages was unconstitutional and is without effect. Under the Constitution of the United States and the State of Alabama, the Alabama Supreme Court cannot abolish the cap created by the Legislature on punitive damages through judicial fiat. See Honda Motor Co. v. Oberg, [512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336] (1994)."
This action is distinguishable from Goodyear Tire & Rubber Co. v. Vinson, 749 So.2d 393 (Ala.1999), because Horton Homes cited Vinson in its motion for a remittitur, arguing in that motion that this Court's ruling abolishing the cap on punitive damages was unconstitutional and that Brooks's claim for punitive damages was subject to the statutory cap on punitive damages. The trial court denied the motion for a remittitur; it did not reduce the punitive-damages award to $250,000. The trial court's decision not to apply the cap was an adverse ruling.
However, Horton Homes does not on appeal argue the issue raised by its motionwhether this Court's holding "abolishing the legislatively created cap on punitive damages was unconstitutional." This Court will not consider an issue not argued, except in exceptional circumstances, and we find no exceptional circumstances in this case. See Armstrong v. Roger's Outdoor Sports, Inc., supra, in which there were three dissents, including one by the author of this present opinion. Therefore, the question whether Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993), insofar as it held unconstitutional the $250,000 cap on punitive damages violated the separation-of-powers doctrine of the Alabama Constitution is not before us. See Goodyear Tire & Rubber Co. v. Vinson, supra; Ex parte Apicella, 809 So.2d 865 (Ala.2001), and the authority cited therein. In Cooper Industries, 532 U.S. at 432-33, 121 S.Ct. at 1683-84, the United States Supreme Court held:
"[L]egislatures enjoy broad discretion in authorizing and limiting permissible punitive damages awards. Cf. Gore, 517 U.S., at 568, 116 S.Ct. 1589 (`States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases in any particular case'). A good many States have enacted statutes that place limits on the permissible size of punitive damages awards. When juries make particular awards within those limits, the role of the trial judge is `to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59[, Fed.R.Civ.P.,] [in Alabama state courts by reference to the standards enunciated in Gore and in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989)], whether a new trial or remittitur should be ordered.' Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). If no constitutional issue is raised, the role of the appellate court, at least in the federal system [and in the state courts in Alabama], is merely to review the trial court's `determination *59 under an abuse-of-discretion standard.'"
Consistent with the direction of the United States Supreme Court that the amount of a punitive-damages award be reviewed de novo when constitutional issues have been raised, this Court has reviewed actions in which punitive damages were awarded for fraud, for trespass, or for conversion; some of the awards this Court has affirmed[11] and some of them it has affirmed on the condition that the plaintiff agree to a remittitur of a portion of the punitive-damages award.[12]
Following our de novo review, we direct that the plaintiff reduce the punitive-damages award to $150,000 (a remittitur of $450,000). If within 30 days Brooks files with this Court an acceptance of the remittitur, then the punitive-damages award, as reduced, will be affirmed. If he does not, then the judgment will be reversed and the case remanded for a new trial.
APPLICATIONS OVERRULED; OPINION OF JULY 13, 2001, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED CONDITIONALLY.[*]
LYONS, JOHNSTONE, HARWOOD, and STUART, JJ., concur.
BROWN and WOODALL, JJ., concur in the result.
MOORE, C.J., concurs in part and dissents in part.
SEE, J., dissents.
MOORE, Chief Justice (concurring in part and dissenting in part).
I would affirm the judgment, without a remittitur. I respectfully dissent from the order requiring a remittitur of the punitive-damages award, because I would defer to the jury and the trial judge, who were present during the fact-finding process of the trial. I question this Court's reliance on Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), to change this Court's standard of review of punitive-damages awards. In that case, the United States Supreme Court required that federal *60 appellate courts perform a de novo review of punitive-damages awards alleged to be excessive, to determine whether they are so large as to violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, but that decision would not require this Court to change its standard. Also, because the Alabama Legislature has enacted tort-reform legislation, I question the appropriateness of this Court's providing a de novo review of punitive-damages awards in cases filed after the effective date of Act No. 99-358, Ala. Acts 1999, amending Ala. Code 1975, § 6-11-21.
I also disagree with the Court's explanation as to why Horton Homes' argument that the wanton-repair claim should not have not been submitted to the jury is incorrect.
According to Horton Homes, the wanton-repair claim should not have been submitted to the jury because, it argues, Brooks failed to prove that, as a result of Horton Homes' negligent conduct, he suffered a physical injury or was placed in immediate physical danger; thus, Horton Homes argues, Brooks is not entitled to mental-anguish damages under the wanton-repair claim. If Horton Homes is correct that the wanton-repair claim should not have been submitted to the jury, then an award of any damages, whether compensatory or punitive, under the wanton-repair claim would be error. The majority opinion concludes that even if Horton Homes' argument is correct (and it expresses no opinion on that point), the submission of the wanton-repair claim to the jury was not error. It concludes that because the jury returned a general verdict "there is no basis to believe that any mental-anguish damages were awarded under the wanton-repair claim as opposed to the breach-of-warranty claims." 832 So.2d at 50.
However, Horton Homes did not object to the trial judge's jury instruction on this issue; therefore, it did not preserve this issue for appellate review. "Unchallenged jury instructions become the law of the case. Louisville & Nashville R.R. v. Atkins, 435 So.2d 1275 (Ala.1983). The jury is bound to follow such instructions, even if they are erroneous." Clark v. Black, 630 So.2d 1012, 1017 (Ala.1993)
Horton Homes never properly objected to the jury charge on damages for mental anguish. It attempts to argue on rehearing that it submitted an alternative jury charge on that issue, which the trial judge did not give, and that by submitting the alternative charge it adequately preserved the issue for appellate review. However, an objection must be brought to the attention of the trial judge with specificity at the time the alleged error is made. See Rule 51, Ala. R. Civ. P.; Harper v. GFA Transp. Co., 432 So.2d 1234 (Ala.1983). As a result, Horton Homes cannot now object to the submission of that claim to the jury.
As to all other issues, I concur.
SEE, Justice (dissenting).
I do not believe the two "Certificates of Quality Assurance" were "written warranties" within the meaning of 15 U.S.C. § 2301(6)(A); therefore, I believe Horton Homes' disclaimer was sufficient to preclude Brooks's breach-of-implied-warranty claim. See 15 U.S.C. § 2308(a) (providing, in relevant part, that "[n]o supplier may disclaim ... any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product").
A "written warranty" is defined by the Magnuson-Moss Act as:

*61 "(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time....
"....
"which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product."
15 U.S.C. § 2301(6)(A).
The two Certificates of Quality Assurance state that "Your new home has been carefully inspected to ensure quality and cleanliness," and that it was "Built for a Lifetime!" The majority presumes that these statements were written warranties under the Act. 832 So.2d at 49. Neither statement, however, speaks to the "nature of the material or workmanship" or "promises that such material or workmanship is defect free or [that it] will meet a specified level of performance over a specified period of time," as is required by 15 U.S.C. § 2301(6)(A) for it to constitute a "written warranty." See Simmons v. Taylor Childre Chevrolet-Pontiac, Inc., 629 F.Supp. 1030, 1032 (M.D.Ga.1986) (holding that the description of an automobile as "new" on the dealer's invoice was not a "written warranty" under the Act because, among other things, it did not promise a specified level of performance relating to a specified period of time); see also Marine Midland Bank v. Carroll, 98 A.D.2d 516, 519, 471 N.Y.S.2d 409, 411 (1984) (holding that the "Dealer's Pre-Delivery Inspection Requirements" form was a "written warranty" under § 2301(6)(A) because it did "represent[] that the motor home had been inspected and tested and was found to `perform, function, operate and/or serve exactly as intended'"); Freeman v. HUBCO Leasing Inc., 253 Ga. 698, 702, 324 S.E.2d 462, 467 (1985) (holding that the warranty, which stated, among other things, that it covered "defects in materials or workmanship caused in the manufacture or assembly of any part of the vehicle" constituted a "written warranty" under § 2301).
Because the Certificates of Quality Assurance do not constitute "written warranties," as that term is defined in the Magnuson-Moss Warranty Act, Horton Homes' disclaimer was sufficient to preclude Brooks's breach-of-implied-warranty claim. Therefore, I would hold that the trial court erred in submitting Brooks's breach-of-implied-warranty claim to the jury.
I, therefore, respectfully dissent.
NOTES
[1] Brooks's original complaint against Horton Homes contained nine countscounts alleging breach of express warranty, breach of implied warranty, violation of the Magnuson-Moss Warranty Act, negligent construction, wanton construction, negligent repair, wanton repair, fraudulent concealment, and misrepresentation. Brooks later amended the complaint to add George Morgan as a defendant and to state three counts against him negligent transportation, delivery, and set-up; wanton transportation, delivery, and set-up; and failure to disclose. Brooks amended the complaint a second time to add three counts against Horton Homescounts alleging "misleading warranty under Magnuson-Moss Warranty Act," breach of warranty, and violation of the Magnuson-Moss Warranty Act.
[2] The remaining counts against Horton Homes were either withdrawn by Brooks or were disposed of by a judgment as a matter of law. At the conclusion of the trial, Brooks dismissed all claims against George Morgan, and those claims were not submitted to the jury.
[3] The "LIMITED ONE-YEAR WARRANTY," found on page 69 of the "Home Owner's Manual," stated, in part:

"This warranty gives you specific legal rights and you may also have other legal rights which vary from state to state. Horton Homes, Inc. makes the foregoing warranty expressly IN LIEU OF ANY OTHER EXPRESS OR IMPLIED WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS, WHICH IMPLIED WARRANTIES ARE HEREBY EXPRESSLY EXCLUDED, and expressly in lieu of any other obligation on the part of the manufacturer."
[4] In Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 511 n. 1 (Ala.2000), Washington contended that Southern, the manufacturer, was liable under implied warranties because he had specially ordered the mobile home that Southern Energy Homes had manufactured. In Washington, 774 So.2d at 509, the one-year warranty conspicuously purported to exclude implied warranties. This Court affirmed the trial court's judgment entered on the jury's verdict awarding damages to Washington. One of the claims submitted to the jury alleged breach of implied warranties. However, no issue regarding the effect of the purported exclusion of implied warranties on Washington's claim alleging breach of implied warranties was raised or addressed in this Court's opinion in Washington.
[5] The Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 through 2312, applies to mobile homes. Liberty Homes, Inc. v. Epperson, 581 So.2d 449, 453 (Ala.1991).
[6] In Auburn Ford, Lincoln Mercury, Inc. v. Norred, 541 So.2d 1077 (Ala.1989), Lisa Norred purchased a used automobile and an "Extended Service Contract" from Auburn Ford. This Court, relying on 15 U.S.C. § 2308(a), stated that while Auburn Ford's "as is" disclaimer would normally be sufficient to preclude Norred's breach-of-warranty claim, her purchase of the service contract rendered Auburn Ford's disclaimer ineffective to exclude any implied warranties. 541 So.2d at 1080.
[7] A homeowner or homebuyer may recover compensatory damages for mental anguish resulting from a breach of contract or warranty in the sale or repair of the home, regardless of the zone of danger. Southern Energy Homes, Inc. v. Washington, 774 So.2d 505, 518-19 (Ala.2000); Sexton v. St. Clair Fed. Sav. Bank, 653 So.2d 959, 960-62 (Ala. 1995); Liberty Homes, Inc. v. Epperson, 581 So.2d 449, 453-54 (Ala.1991); Lawler Mobile Homes, Inc. v. Tarver, 492 So.2d 297, 306 (Ala.1986).
[8] In Washington, 774 So.2d at 515-16, this Court stated:

"McNutt testified on direct examination that Southern would have responded if Washington and his wife had actually made any of the telephone calls that they alleged. McNutt reaffirmed this assertion on cross-examination and testified further that Southern did not let any consumer complaints go unanswered. In response, Washington questioned the representative about documents, filed with the Alabama Manufactured Housing Commission, that contained allegations from 113 other homeowners that Southern had not responded to their complaints.... The trial court expressly limited Washington's use of the documents to impeachment purposes and prohibited Washington from using the documents for proving the truth of the matters asserted therein. In light of the fact that McNutt attempted to bolster his testimony by asserting that Southern never lets any customer complaint go unanswered, the trial court did not abuse its discretion in determining that the prejudicial impact of the impeachment questioning did not substantially outweigh the probative value of those questions."
(Citations omitted.) In the present case, Horton Homes' position was that Brooks did not wait long enough before suing for it to have an opportunity to repair the defects. It was Brooks's position, while arguing against the motion in limine, that he should be allowed to question the Horton Homes' representative about other lawsuits and complaints that alleged that Horton Homes had failed to make repairs. The trial court agreed.
Additionally, we note that in its instructions to the jury the trial court stated:
"In regards to the other lawsuits filed against [Horton Homes], ladies and gentlemen, the Court instructs you as follows: The complaint in a lawsuit is no more than a means of commencing an action. And the mere filing thereof does not importlet me start it again.
"The complaint in a lawsuit is no more than a means of commencing an action. And the mere filing thereof does not import verity even in the proceeding in which it was filed.
"Some of the evidence in this case, ladies and gentlemen, namely testimony that other lawsuits have been filed against [Horton Homes], has been received in evidence for a limited purpose. And you should consider this evidence along with all the other evidence in the case material to the issues but only for the purpose for which it was received."
[9] Brooks retained Randall Chesser to inspect his mobile home for defects. Chesser prepared a "cost-to-cure (repair) analysis," wherein he found that the manufacturer should be responsible for $12,295 in repairs and that the dealer should be responsible for $4,900 in repairs. Chesser testified at trial, and his "cost-to-cure (repair) analysis" was introduced into evidence.
[10] In Swift v. Gregory, 786 So.2d 1097, 1100 (Ala.2000), this Court held: "Once the Code Commission modifies an act and the Legislature thereafter adopts a Code containing the modification, the modification has the effect of law." However, this Court finds that after the modification of Act No. 99-358 by the Code Commissioner, the Legislature did not adopt a Code containing the modification until May 1, 2001, well after the date the judgment was entered in this action. See Act No. 2001-344, Ala. Acts 2001; see also Densmore v. Jefferson County, 813 So.2d 844 (Ala.2001).
[11] New Plan Realty Trust & New Plan Realty Trust of Alabama, Inc., d/b/a The Club Apartments v. Morgan, 792 So.2d 351 (Ala.2000); Sheffield v. Andrews, 679 So.2d 1052 (Ala. 1996); King Motor Co. v. Wilson, 612 So.2d 1153 (Ala.1993); O.K. Bonding Co. v. Milton, 579 So.2d 602 (Ala.1991); German Auto, Inc. v. Tamburello, 565 So.2d 238 (Ala.1990); Griggs v. Finley, 565 So.2d 154 (Ala.1990); Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989); Fruehauf Corp. v. Welch, 519 So.2d 502 (Ala.1988); Bernie Hughes Lincoln Mercury v. Merritt, 523 So.2d 441 (Ala.Civ.App. 1988); Larry Savage Chevrolet, Inc. v. Richards, 470 So.2d 1168 (Ala.1985); Fountain-Lowrey Enters., Inc. v. Williams, 424 So.2d 581 (Ala.1982); Montgomery Lincoln-Mercury, Inc. v. Gaioni, 402 So.2d 928 (Ala.1981); Gunite Contracting Co. v. Mize, 341 So.2d 694 (Ala.1977).
[12] Chrysler Corp. v. Schiffer, 736 So.2d 538 (Ala.1999); BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997); Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997).
[*] Note from the reporter of decisions: On April 8, 2002, the Supreme Court issued a "certificate of judgment of affirmance" reading in part as follows:

"WHEREAS, the appellee, Scott Brooks, did on December 4, 2001, file in this Court an acceptance of remittitur in the amount of $450,000 of the punitive damages awarded.
"IT IS NOW CONSIDERED, ORDERED AND ADJUDGED that the judgment of the circuit court be reduced to $300,000, plus attorney fees and costs awarded, and as thus reduced, the judgment of the circuit court is hereby affirmed, with interest and costs.
"IT IS FURTHER ORDERED AND ADJUDGED that the appellants, Horton Homes, Inc., and Southern Manufactured Homes, Inc., pay the costs of appeal and costs taxed against the defendants in the court below will stand as taxed."